**HUNTON ANDREWS KURTH LLP**
Ann Marie Mortimer (SBN 169077)
amortimer@HuntonAK.com
Jeff R. R. Nelson (SBN 301546)
jnelson@HuntonAK.com
550 South Hope Street, Suite 2000
Los Angeles, California  90071
Telephone: (213) 532-2000
Fax: (213) 532-2020

James W. Bowen (admission *pro hac vice* pending)
jbowen@HuntonAK.com
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000
Fax: (214) 880-0011

Attorneys for Plaintiff,
RED BULL NORTH AMERICA, INC.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California  90071-2627

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| RED BULL NORTH AMERICA, INC., | Case No.:  2:20-cv-08703 |
| Plaintiff, | **COMPLAINT** |
| v. | |
| KC DISTRIBUTING, LLC, | |
| Defendant. | |

COMPLAINT

1

## **INTRODUCTION**

2   1.   Red Bull North America, Inc. ("Red Bull") brings this action against KC

3   Distributing, LLC ("KCD") due to KCD's failure to honor its obligations and duties

4   under the parties' distribution agreement entered into as of July 1, 2008 (the

5   "Distribution Agreement").   KCD was a non-exclusive distributor of Red Bull's

6   products in North Texas under the terms of the fully integrated Distribution Agreement

7   negotiated at arm's length by sophisticated parties.

8   2.   The Distribution Agreement clearly and unambiguously provides that it

9   was an "at-will" agreement and both Red Bull and KCD could terminate the

10   Distribution Agreement "without cause" on thirty-days' written notice.   On February

11   13, 2020, Red Bull notified KCD that it was terminating the Distribution Agreement

12   effective July 1, 2020 (as extended by agreement).   KCD contends that the termination

13   was a breach of the Distribution Agreement or otherwise improper.   Red Bull seeks a

14   judgment declaring that it properly terminated the Distribution Agreement without

15   cause and has no liability to KCD.

16   3.   Further, after Red Bull notified KCD that it was terminating the

17   Distribution Agreement without cause, KCD breached the Distribution Agreement as

18   more fully described below, causing Red Bull more than $2.4 million in damages.   Red

19   Bull seeks judgment against KCD for all damages proximately caused by KCD's breach

20   of the Distribution Agreement.

21   4.   Finally, because of KCD's breaches of the Distribution Agreement, Red

22   Bull terminated the Distribution Agreement "for cause" effective June 25, 2020, after

23   providing KCD multiple notices and opportunities to cure.   KCD contends that Red

24   Bull's termination for cause was improper.   In the unlikely event the Court determines

25   that Red Bull's termination without cause was ineffective, Red Bull seeks a declaratory

26   judgment that it properly terminated the Distribution Agreement "for cause."

27

28

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

**PARTIES**

5.     Red Bull is a California corporation with its principal place of business in Santa Monica, California.  Accordingly, Red Bull is a citizen of California.

6.     KCD is a Texas limited liability company with its principal place of business in Denton County, Texas.  Upon information and belief, KCD's sole member is William Kelly Clymer, an individual citizen of the State of Texas.  Accordingly, KCD is a citizen of Texas.  KCD may be served through its registered agent, Allen C.  Klein, 5420 Lyndon B.  Johnson Freeway, Suite 1200, Dallas, Texas 75240.

**JURISDICTION AND VENUE**

7.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

8.     This Court has personal jurisdiction over KCD because KCD expressly consented to this Court's jurisdiction in Section C(1) of Schedule F of the Distribution Agreement described below.

9.     Venue is proper in this District under 28 U.S.C. § 1391(b) because KCD agreed that the litigation of any dispute arising out of or relating to the Distribution Agreement must take place in Los Angeles County, California state or federal courts and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

**FACTUAL BACKGROUND**

10.     Red Bull produces and distributes premium energy drink products that are sold in more than 170 countries around the world.  Red Bull's distribution network is the backbone of its business, ensuring that its millions of customers can purchase Red Bull Energy Drink in virtually any store.  Red Bull invests significant effort and capital in selecting top distributors that will best represent the brand and achieve success in the applicable market.  And it regularly monitors the progress of each of its distributors to ensure prompt product delivery, achievement of sales targets, consistent in-store

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

execution aligned with national standards, and excellent customer service, among other measures of success.  In this context, Red Bull makes changes as appropriate in its distributor relationships to best support its business.  Its distribution agreement is designed to drive this focus and support the requisite flexibility by allowing for "at-will" termination by either Red Bull or its distributor without cause and for any reason with thirty-days' written notice.

11.    The Distribution Agreement was the product of arm's length negotiations between sophisticated and experienced parties.  A copy of the Distribution Agreement is attached as Exhibit 1.  At the conclusion of the negotiations, both Red Bull and KCD had the option to accept or reject the deal.  Both parties, however, decided to sign the document, and they operated under the Distribution Agreement for more than a decade.

12.    Subsection VIII of the Distribution Agreement unambiguously provides that it is an "at-will" agreement and that either party may terminate the Distribution Agreement, "Without Cause," on thirty-days' written notice.

13.    On February 13, 2020, Red Bull notified KCD in writing that it was terminating the Distribution Agreement, without cause, effective May 1, 2020.  A copy of the without cause termination letter is attached as Exhibit 2.  The parties jointly agreed to extend the effective date of the termination to July 1, 2020.

14.    After Red Bull notified KCD that it was terminating the Distribution Agreement, KCD breached the Distribution Agreement in multiple ways.  To start, KCD failed to pay to Red Bull approximately $2.4 million for product that Red Bull delivered to KCD and that KCD re-sold.  Further, KCD filed a lawsuit (the "Texas Lawsuit") against Red Bull and others in the 298th Judicial District Court of Dallas County, Texas claiming, among other things, that Red Bull improperly terminated the Distribution Agreement.  A copy of the Texas Lawsuit is attached as Exhibit 3.  By filing the Texas Lawsuit,  KCD breached the Distribution Agreement in at least two ways: (1) the Distribution Agreement requires that the parties mediate all disputes prior instituting litigation, but KCD failed to request, much less complete, mediation before

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

filing the Texas Lawsuit;[1] and (2) the Distribution Agreement required KCD to bring all litigation "arising under or relating to" the Distribution Agreement in this District.

15.     Because KCD breached the Distribution Agreement by failing to pay the amounts due thereunder, Red Bull—after providing KCD with the notices and opportunities to cure required by the Distribution Agreement—terminated the Distribution Agreement "for cause" effective June 25, 2020.  A copy of the for cause termination letter is attached as Exhibit 4.  That same day, KCD's counsel wrote to Red Bull alleging, among other things, that Red Bull had engaged in "thug-like tactics" and breached the Distribution Agreement.  A copy of KCD's counsel's letter is attached as Exhibit 5.  Those allegations are false.  Red Bull at all times complied with the Distribution Agreement, and, as explained above, it was KCD, not Red Bull, that breached the Distribution Agreement.

## FIRST CAUSE OF ACTION

### [Breach of Contract]

16.     Red Bull incorporates all other paragraphs as if fully set forth here.

17.     As more fully described above, KCD breached the Distribution Agreement.  Red Bull has suffered damages as a result of KCD's breaches.  Those damages are continuing.  Red Bull seeks judgment against KCD for the damages proximately caused by its breaches of the Distribution Agreement.

## SECOND CAUSE OF ACTION

### [Declaratory Judgment]

18.     Red Bull incorporates all other paragraphs as if fully set forth here.

19.     As more fully described above, actual controversies within the Court's jurisdiction exist between Red Bull and KCD.  Accordingly, under 28 U.S.C. § 2201, the Court may declare the rights and other legal relations of Red Bull and KCD.

20.     Red Bull seeks the judgment of this Court declaring:

[1]     The parties mediated this dispute on September 22, 2020, after KCD filed the Texas Lawsuit.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

4

COMPLAINT

a.      Red Bull properly and in full compliance with the Distribution Agreement terminated the Distribution Agreement without cause effective July 1, 2020;

b.      Red Bull at all times complied with and did not breach the Distribution Agreement;

c.      Red Bull properly and in full compliance with the Distribution Agreement terminated the Distribution Agreement "for cause" effective June 25, 2020; and

d.      Red Bull has no liability and is not indebted to KCD as a result of Red Bull's termination of the Distribution Agreement or for any other reasons.

## **DEMAND FOR RELIEF**

THEREFORE, Red Bull prays for judgment as follows:

1.      In favor of Red Bull and against KCD for the amounts due to Red Bull caused by KCD's breaches of the Distribution Agreement and for attorneys' fees, costs, and interest to the extent allowed by law and the Distribution Agreement;

2.      Declaratory relief as described above; and

3.      All other relief as the Court deems proper.

DATED:  September 22, 2020             **HUNTON ANDREWS KURTH LLP**


By: _/s/ Ann Marie Mortimer_

Ann Marie Mortimer
James W. Bowen
Jeff R. R. Nelson
Attorneys for Plaintiff
RED BULL NORTH AMERICA, INC.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

COMPLAINT

**EXHIBIT 1**

# RED BULL
## DISTRIBUTION AGREEMENT

This Distribution Agreement ("Agreement") is made and entered into as of _July 1_____, 2008 ("Effective Date") by and between Red Bull North America, Inc., a California corporation ("Company") and KC Distributing, LLC ("Distributor") subject to the following recitals:

## R E C I T A L S

A.      Company is the exclusive distributor in the United States of RED BULL brand beverages.

B.      Company and Distributor have been parties to a Distribution Agreement ("Existing Distribution Agreement") whereby Distributor has acted as an authorized distributor of certain RED BULL brand beverages in an assigned geographic area on the terms of the Existing Distribution Agreement.

C.      The Parties have decided to enter into a new distribution agreement to define their relationship and each of their respective rights and obligations on the terms and conditions set forth in this Agreement that will supersede the Existing Distribution Agreement.

D.      Accordingly, Company and Distributor are willing to terminate the Existing Distribution Agreement and enter into this Agreement.  The parties acknowledge that concurrently with executing this Agreement, they are entering into a separate Mutual Termination and Mutual General Release Agreement as of the Effective Date.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which the parties hereby mutually acknowledge the parties agree as follows:

I.      DEFINITIONS.

A.      Accounts are Persons which Distributor knows, or has good cause to believe after reasonable inquiry, purchase Product with the intent of reselling Product only to Persons for ultimate consumption.

B.      Affiliate means any entity that directly or indirectly controls, is controlled by, or is under common control with, a party to this Agreement.  Affiliate expressly includes, without limitation: (i) a party's immediate parent, ultimate parent and each parent company in between the immediate and ultimate parent (each is referred to as a "Parent"), (ii) each subsidiary of a party, and (iii) every other entity of which the party or the party's Parent or subsidiary owns a Controlling Interest.

C.      Applicable Law means the applicable common law and all statutes, laws, rules, regulations, ordinances, polices and procedures established by any governmental authority with jurisdiction over the parties that are in effect on or after the Effective Date, as they may be amended from time to time.

D.      Brand Training refers to any training that Company may, in its discretion, from time to time provide in sales techniques, Product information, solicitation and management of Accounts, local marketing, record keeping, and other subjects pertinent to the discharge of Distributor's duties.

E.      Company's Headquarters shall mean the principal place of business of the Company during the Term, which Company may relocate in its sole discretion as frequently as Company deems necessary.

F.      Competitive Product includes every beverage, non-beverage food and other category of goods, which claims to improve personal energy, physical or cognitive performance, endurance, vitalization or offer comparable benefits regardless of how or where the claims are made or who makes the claims.  Additionally, if Company makes Red Bull Cola available to Distributor for sale in the Territory, the parties agree that Competitive Product shall then be expanded to include every cola soft drink and cola beverage.  For purposes of clarifying the scope of goods included within the definition of Competitive Product, the parties understand and agree that

Competitive Product includes, without limitation, any beverage (whether alcoholic or non-alcoholic, carbonated or non-carbonated or formulated or possessing any other distinguishing characteristic) and non-beverage food or other category of goods regardless of the format in which it is sold or packaged (for example, regardless of whether in ready-to-drink, ready-to-consume, concentrate, power, frozen, mixed with another beverage of some kind, or in any other format) and whether or not the goods are manufactured, distributed, marketed, advertised or sold on the Effective Date or first manufactured, distributed, marketed, advertised or sold during the Term.

        G.      <u>Confidential Information</u> means all information, data, materials and knowledge which may be disclosed to Distributor in confidence, or which Distributor may learn about, concerning Product, Company, Company's Affiliate, Company's other authorized distributors, or existing or prospective Accounts and should reasonably understand to be confidential. Confidential Information includes, without limitation: (i) any information which concerns the formulae, ingredients, source of ingredients, recipes, specifications, manufacturing processes, or cost data for the manufacture and production of Product; (ii) performance and market testing of Product; (iii) Company's business plans; (iv) wholesale or unpublished price lists of Product; (v) knowledge of the sales, profit performance or other results of operations of Company or Company's other authorized distributors, including financial results; (vi) results of customer and market surveys; (vii) knowledge of supply relationships; (viii) demographic data relevant to identifying potential Accounts; (ix) Product sales results of Accounts; and (x) in general, knowledge about Company, Company's other authorized distributors, or Accounts, whether now known or acquired or created in the future, and whether or not the information is in writing. Confidential Information does not include (x) information which Distributor can demonstrate came to its attention independent of its relationship with Company and before Company's disclosure of the information, and (y) information that is, or has become, generally known in the public domain, except where public knowledge is the result of Distributor's wrongful disclosure, whether deliberate or inadvertent.  Nothing in this Agreement obligates Company to provide Distributor with Confidential Information or entitles Distributor to know or have access to Confidential Information.

        H.      <u>Controlling Interest</u> means the possession, directly or indirectly, of power to direct, or cause a change in the direction of, the management and policies of a business entity.

        I.      <u>Covered Person</u> means: (i) the Person who executes this Agreement as Distributor; (ii) each Person qualifying as Distributor's Affiliate; (iii) each individual included in Distributor's Executive Management; and (iv) each Person who owns a legal or beneficial interest of Distributor or Distributor's Affiliate.

        J.      <u>Distributor's Principal</u> is the Person or Persons who alone, or together, own a Controlling Interest of a Distributor that is a business entity.

        K.      <u>Distributor's Warehouse</u> refers collectively to one or more facilities in the Territory that Distributor identifies to Company in writing at which Distributor receives and ships Product and maintains inventory of Product.

        L.      <u>Effective Date</u> is the date indicated on page 1 of this Agreement.

        M.      <u>Executive Management</u> means every individual who: (i) is a principal officer or member of the board of directors of Distributor if Distributor is a corporation; (ii) is a general partner of Distributor if Distributor is a general or limited partnership; (iii) is a manager of Distributor if Distributor is a limited liability company; (iv) occupies a similar status or performs similar functions, whether as an employee or independent contractor, as an individual identified in (i), (ii) and (iii); or (v) is a General Manager. Distributor represents that **Schedule G** is a true and complete list of Distributor's Executive Management as of the Effective Date**.**

        N.      <u>Force Majeure</u> includes, without limitation, an event caused by or resulting from an act of God; labor strike, lockout or other industrial disturbance; war (declared or undeclared); riot; epidemic; fire or other natural disaster or catastrophe; act of any government; and any other similar cause which is not within a party's control. The determination that an event of Force Majeure has occurred shall be made solely by Company.

O.      General Manager refers to one or more employees of Distributor whom Distributor identifies to Company in writing each of whom devotes full-time and attention to the management and operation of Distributor's business and has primary responsibility and authority for supervising Distributor's duties hereunder and the conduct of Distributor's employees.  Distributor, if an individual, or Distributor's Principal may be designated as a General Manager.

P.      Incapacity is the inability due to medical reasons to devote full time and attention to the administrative and operational activities of the distributorship that continues for at least 120 days in the aggregate during any rolling 12 month period during the Term, based upon the examination and findings of a physician selected by Company.  A period of Incapacity shall continue without interruption unless and until the Person suffering the Incapacity resumes his or her duties on a full time basis for 30 consecutive days.

Q.      Intellectual Property Claims are disputes with third parties involving: (i) Company's or Company's Affiliate's ownership of, or rights in, the Proprietary Marks or Confidential Information; (ii) Distributor's use of, or rights in, the Proprietary Marks or Confidential Information; (iii) the sale of goods which are known, or believed to be, counterfeits, copies, imitations, simulations or infringements of Product, the passing off of goods as Product, or other practices involving illegal conduct; (iv) the use of any mark, trade name, domain name, design, logo or commercial symbol which is or may be confusingly similar to any of the Proprietary Marks; (v) the unauthorized use of information which is, or believed to be, Confidential Information; or (vi) any other practice which does, or threatens to, impair, dilute or infringe Company's or Company's Affiliate's rights in the Proprietary Marks or Confidential Information.

R.      Internet means the electronic network of computers and networking infrastructure accessible by the general public that enables the public to exchange information and perform various functions electronically, including, without limitation, purchasing goods or services from merchant-controlled Internet sites and communicating and sending documents in electronic format.  The Internet includes all successor technology performing comparable functions accessible by the general public whether now existing or developed after the Effective Date.

S.      Local Advertisements include, without limitation, all communications which Distributor creates or adapts and intends to use, directly or indirectly, to advertise, promote or market Product or Distributor's status as an authorized distributor, solicit or recruit new Accounts, or which use the Proprietary Marks.  Local Advertisements shall include, without limitation: (i) written, printed and electronic communications; (ii) communications by means of a recorded telephone message, spoken on radio, television or similar communication media; (iii) promotional items or promotional or publicity events; (iv) listings in approved telephone directories; (v) the use of Proprietary Marks on stationery, business cards, signs, merchandise, brochures, and other tangible personal property; and (vi) the use of Proprietary Marks in a domain name, URL, or otherwise on the Internet.

T.      Person means a natural person, trust or business entity of any kind.

U.      Product is specifically confined to the goods described on **Schedule I**, subject to Company's right to discontinue offering, selling or distributing any of the goods described on **Schedule I** pursuant to the procedures set forth in this Agreement without terminating this Agreement.  Except as provided in this Agreement, Product does not include any other type or brand of beverage, non-beverage food or other category of goods or services of any kind which Company or Company's Affiliates now, or in the future, may produce, market, distribute or sell.

V.      Proprietary Marks mean collectively the RED BULL trademark and the other trademarks, service marks, trade names, words, designs, graphics, 3-dimensional objects, symbols, logos, slogans, domain names, URLs and other identifications of Company, Company's Affiliate, or Product which Company designates in writing to Distributor from time to time.

W.      Recall/Withdrawal Event refers to actions which for any reason: (i) Company or a government authority may take regarding a Recalled Product, or (ii) Company may take regarding a Withdrawn Product.

{00011497 V1}

X.     Recalled Product refers to Product which Company or a binding governmental authority for any reason determines: (i) may violate Applicable Law; or (ii) the use or consumption of which may pose an undue risk to public health or safety.

Y.     RED BULL Display Equipment refers to any point-of-sale or display refrigeration or similar types of display equipment for use in marketing and displaying Product.

Z.     RED BULL Product Advertising refers to all materials created, distributed or otherwise published for the direct or indirect purpose of marketing and promoting Product, including, without limitation, point-of-sale materials, advertising formats and slicks, floor displays, Product literature or other promotional materials that display the Proprietary Marks, regardless of the intended media or format of the materials (including, without limitation, print, graphic, electronic, audio, video, pictorial, 3-dimensional or other formats).

AA.     Term is the period starting on the Effective Date and ending on the date that this Agreement terminates.

BB.     Terms of Use Agreement is the written contract in the form of **Schedule C** between Distributor and an Account in the Territory for the use of specific RED BULL Display Equipment identified in the Terms of Use Agreement.

CC.     Territory is the geographic area shown on **Schedule B**.

DD.     Van Sales Teams refer to Distributor's employees who sell Product by direct store delivery to Accounts in accordance with Company's merchandising methods and who complete delivery in specially decorated vehicles meeting Company's imaging specifications on the terms set forth in **II(A)(4)**.

EE.     Withdrawn Product refers to Product which Company for any reason, in its sole discretion, elects to physically remove from sale within a geographic area that includes the Territory.  For example and without limitation, Withdrawn Product includes Product that Company elects to remove: (i) pursuant to a decision to change its distribution method or for other valid business reasons; or (ii) because the age of particular Product, damage to Product containers or other kind of distressed condition of particular Product is such that Company believes the sale, use or consumption of Product might be detrimental or harmful to the good name, goodwill or reputation of Company or the Proprietary Marks even though the sale, use or consumption of Product would not, in Company's judgment: (a) violate Applicable Law; or (b) pose an undue risk to public health or safety.

II.     APPOINTMENT.

A.     Nonexclusive Appointment.

1.     Company hereby appoints Distributor, during the Term, as an authorized distributor on a nonexclusive basis with the right to purchase Product from Company and market, distribute and sell Product solely and directly to Accounts in the Territory on the terms and conditions of this Agreement.  Distributor hereby accepts such appointment on the terms and conditions of this Agreement.  Distributor acknowledges that it has paid nothing, directly or indirectly, to Company in exchange for this appointment.

2.     The goods described on **Schedule I** include Red Bull Cola based on Company's plan to sell Red Bull Cola in the Territory sometime in the reasonably foreseeable future.  Distributor understands and agrees that Company has no firm launch date at this time to begin selling Red Bull Cola in the Territory.  Distributor accepts that Company may decide for its own business reasons not to introduce Red Bull Cola in the Territory after the Effective Date, while proceeding with the sale, distribution and marketing of Red Bull Cola in other parts of the United States.  Company's decision not to sell Red Bull Cola in the Territory shall not give rise to any liability to Distributor.

{00011497 V1}

-4-

3.      An Account shall be deemed to be "in the Territory" if the Account: (i) takes delivery of Product at a location in the Territory, and (ii) sells Product from a location in the Territory to Persons for ultimate consumption. Distributor shall not ship or transfer Product at the request of an Account in the Territory to a location outside of the Territory.

4.      Distributor's appointment shall include the obligation to market, distribute and sell Product using Van Sales Teams in the Territory, except as set forth on an executed copy of **Schedule A**. Distributor shall also comply with the following terms regarding such Van Sales Teams:

> a)      To ensure prompt, efficient and courteous delivery services to Accounts in the Territory, at Distributor's sole cost and expense, Distributor shall obtain, either by purchase or lease, appropriate delivery vehicles meeting Company's specifications and decorate them in accordance with Company's imaging requirements. Throughout the Term, Distributor shall insure and maintain such vehicles in safe condition and repair.

> b)      Distributor's Van Sales Teams shall deliver Product to Accounts in the specially decorated vehicles in accordance with Company's merchandising standards, meeting at all times, the requirements of Applicable Law.

> c)      Distributor shall maintain the minimum number of Van Sales Teams as established by the Company, in its sole discretion, from time to time. Company may make changes to such requirements upon sixty (60) days prior written notice to Distributor. Distributor shall be required to maintain the Van Sales Teams at Distributor's sole cost and expense.

> d)      Distributor shall promptly modify its delivery vehicles following notice from Company of any improvements or modifications which Company makes to its vehicle or imaging specifications.

> e)      Distributor and Distributor's Van Sales Teams shall use the delivery vehicles exclusively to carry and deliver Product to, or from, Accounts in the Territory. Delivery vehicles shall not be used to carry or deliver any other brands of goods or any other thing or article not required to carry out the purposes of this Agreement.

5.      Distributor understands and agrees that its obligations under this Agreement shall apply to Distributor's marketing, sale and distribution of all Product in Distributor's possession on the Effective Date or which Distributor takes delivery of after the Effective Date.

B.      <u>Scope of Appointment</u>. For purposes of this Agreement:

1.      Distributor's rights granted by this Agreement apply only to Product identified on **Schedule I**. Nothing in this Agreement gives Distributor any right or preference to be appointed as an authorized distributor of any other type or brand of beverage, non-beverage food or other category of goods or services of any kind which Company or Company's Affiliates now, or in the future, may produce, market, distribute or sell.

2.      Nothing in this Agreement obligates Company to offer Distributor the opportunity to market, distribute and sell any other beverage, non-beverage food or other category of goods that Company or Company's Affiliates may now, or in the future, produce, own, distribute or sell, or have the right to distribute or sell. Any offer that Company may make to Distributor to market, distribute or sell any other goods that Company or Company's Affiliates may now, or in the future, produce, own, distribute or sell, or have the right to distribute or sell shall not be valid unless the material terms of the offer are in writing and accepted by Distributor in writing. If Company chooses to offer Distributor the opportunity to market, distribute and sell one or more additional goods, Company shall not be bound to offer Distributor the opportunity to market, distribute or sell any other goods that Company or Company's Affiliates may now, or in the future, produce, own, distribute or sell. Distributor

{00011497 V1}

-5-

understands that Company may offer certain of its authorized distributors the right to market, distribute and sell specific goods that are not included within the scope of the term Product as defined in this Agreement. Distributor shall have no right to object to the fact that Company offers other distributors the right to market, distribute and sell other goods or services that are not identified on **Schedule I** without offering Distributor the same right.

C.   Company's Rights.

1.   Without prior notice to, or consent of Distributor, Company may: (i) sell Product to any Person in, and outside of, the Territory including, without limitation, to Accounts in the Territory; or (ii) enter into other distribution, sales representative, or marketing arrangements of any kind with any Person for the marketing, distribution or sale of Product in, and outside of, the Territory;

2.   Distributor understands and agrees that Company has not made any express or implied promise to continue distributing in the United States, or in the geographic market in which the Territory is located, any or all of the particular goods identified on **Schedule I** as Product for any minimum period of time. Distributor understands and agrees that at any time, upon 30 days written notice to Distributor, Company may, in its sole discretion and for any reason discontinue offering, selling or distributing some or all of the goods identified on **Schedule I** as Product in the United States or in all, or a substantial portion, of the geographic market in which the Territory is located. Company's right to discontinue offering, selling or distributing Product is not in lieu of its right to terminate this Agreement without cause by giving written notice as provided in this Agreement. The parties furthermore agree that if Company, pursuant to the authority of this Section, decides to discontinue offering, selling or distributing some of the goods identified on **Schedule I**, but fewer than all of them, then the following conditions shall apply:

a)   This Agreement shall continue in full force and effect.

b)   The definition of Product shall automatically be amended for purposes of new purchase orders placed by Distributor after the date of Company's written notice to mean only the remaining goods identified on **Schedule I** which Company has not discontinued.

c)   Company's decision to discontinue the sale, distribution and marketing of one or more of the goods identified on **Schedule I**, but fewer than all of them, shall not operate to revive the Existing Distribution Agreement.

d)   Company shall complete shipment of any discontinued goods purchased by Distributor under purchase orders which Company has accepted before giving written notice pursuant to this Section. After giving written notice pursuant to this Section, Company shall have no obligation to accept new purchase orders for discontinued goods. Company shall furthermore be relieved from any obligations with respect to orders which Distributor has placed, but which have not been accepted, for discontinued goods before Company's written notice.

e)   Company shall have no obligation to existing or prospective Accounts on account of its decision to discontinue offering, selling or distributing some of the goods identified on Schedule I.

3.   At any time upon 30 days written notice to Distributor, Company may, in its sole discretion and for any reason, reduce the size or change the boundaries of the Territory without liability or obligation to Distributor or any Account. Company's reduction or modification of the Territory pursuant to this provision which leaves some portion of the Territory available for Distributor to continue to market, distribute and sell Product shall not constructively, or actually, result in the termination of this Agreement. The parties agree that, after the 30 day notice period expires, this Agreement shall automatically be amended to reset the boundaries of the Territory according to the boundaries identified in Company's notice given pursuant to this provision.

{00011497 V1}

D.      Limitations.

1.      Nothing in this Agreement gives Distributor: (i) the right to delegate its duties hereunder to, or appoint, sub-distributors or other types of independent agents with authority to sell Product for Distributor except with Company's prior written consent; (ii) the right to manufacture Product; (iii) the right to object to Company's award of marketing or distribution rights to any Person including, without limitation, for a geographic area that includes all or some of the Territory; or (iv) an interest in Company or right to participate in Company's business activities, investment or corporate opportunities.  Distributor understands and agrees that it has no rights with regard to the matters described in (i) through (iv).

2.      Distributor shall not, directly or indirectly, distribute, offer, or sell Product: (i) through mail order, catalog sales, or the Internet; or (ii) to Accounts in the Territory which Distributor knows, or has good cause to believe after reasonable inquiry, purchase Product with the intent of reselling Product either: (x) outside of the Territory through any means; or (y) through mail order, catalog sales, or the Internet.  Distributor understands and agrees that it has no rights with regard to the matters described in (i) and (ii).

3.      During the Term, it shall be a breach of this Agreement for Distributor or any Covered Person, directly or indirectly, to own, engage in or render services to, whether as an investor, partner, lender, member of the board of directors, officer, manager, employee, consultant, representative or agent, any Person located anywhere in the world that manufactures, supplies, distributes, markets, advertises, or sells any Competitive Product.  This provision does not prohibit Distributor or any Covered Person from owning 5% or less of the voting stock of an entity whose shares are publicly traded on a national or foreign stock exchange that manufactures, supplies, distributes, markets, advertises, or sells anything within the scope of the term Competitive Product.

III.    PRODUCT PURCHASES.

A.      Terms of Sale.

1.      All sales of Product to Distributor shall be at such prices and on such cash or credit terms as Company shall establish from time to time.  Company may, in its sole discretion, change prices and terms and conditions of sales, delivery and payment at any time without prior notice to Distributor.  Without limiting the generality of the foregoing, Company's discretion includes, without limitation, the right to require payment in cash either in advance of, or upon, delivery.

2.      All prices of Product shall be at Company's bona fide wholesale prices effective at the time Company accepts Distributor's order of Product.  Company retains absolute discretion to establish and adjust its wholesale prices of Product, to establish policies and discounts for volume purchases, and to establish and impose handling, packing, shipping and delivery charges and discounts for sales of Product.  Without limiting the generality of the foregoing, Company's discretion includes, without limitation, the right to reduce shipping and delivery charges when shipments are made to a central drop-off location.

3.      Distributor shall order Product by submitting Company's current purchase order form in paper, electronic or other commercially reasonable format based on prevailing technology, in the manner and to the address stated on the order form.  All purchases of Product shall be subject to the terms and conditions on the purchase order form, except to the extent that the express terms of Company's purchase order form conflict with the provisions of this Agreement, in which case this Agreement shall control.  The parties understand and agree that the purchase order form's silence about a matter expressed in this Agreement, or this Agreement's silence about a matter expressed in the purchase order form, shall not be considered a conflict between the purchase order form and this Agreement.  Purchase orders shall not be binding on Company unless and until accepted in writing by Company's duly authorized representative.  Company shall have no liability to Distributor for rejecting any purchase order.

4.      All Product shall be shipped or delivered to Distributor's warehouse identified on Distributor's purchase order.  All purchases by Distributor shall be C.I.F. Distributor's Warehouse; provided,

{00011497 V1}

however, Company may, in its discretion, at any time, by written notice, change the terms of sale to F.O.B. Distributor's Warehouse or resume using C.I.F. Distributor's Warehouse, as frequently as Company chooses. The cost of freight, delivery and insurance on Product shipments shall be included in the purchase price of Product; provided, however, Company may, in its discretion, at any time, by written notice, separately invoice Distributor for costs relating to freight, delivery or insurance, or all of them, or otherwise modify the terms of sale. All changes in the terms and conditions of sale shall apply to new orders which Distributor submits after receipt of Company's notice of the change.

        5.     Company shall use reasonable commercial efforts to fill Distributor's orders as promptly as practicable; provided, however, Distributor's orders shall be subject to such allocations as Company, in its sole discretion, may deem necessary or equitable in the event of any shortages of Product, production or delivery delays, or events of Force Majeure. Company shall not be liable to Distributor, or to any Account of Distributor or any other Person if Company fails to deliver Product by a specific date if caused by lack of supply or production or delivery delays or any event of Force Majeure.

        6.     Company may suspend selling Product and shipping Product orders previously accepted by Company, without liability to Distributor or to any Account, if Company determines, in its sole discretion, that it is necessary or advisable to change Product formulae, ingredients or packaging for any reason. Company shall promptly notify Distributor in writing of a suspension due to a change in Product formulae, ingredients or packaging and provide Distributor with its best estimate of the probable length of the suspension; provided, however, Company shall have no liability if its estimate is materially different than the actual length of the suspension. Within 5 days after receiving Company's notice of a suspension due to a change in Product formulae, ingredients or packaging, Distributor may cancel any orders of Product which have not already been shipped by Company.

     B.    <u>Payment Terms</u>.  Without limiting Company's discretion to determine and modify the specific payment terms for Distributor's purchases of Product, the parties agree as follows:

        1.     If Company finds Distributor's creditworthiness satisfactory, Company may offer Distributor credit payment terms subject to Distributor's compliance with Company's credit conditions. Distributor understands and agrees that Company may take into account any factors which it deems relevant in evaluating Distributor's creditworthiness, which evaluation shall be made in Company's sole discretion. This Agreement does not confer upon Distributor the right to credit payment terms. Distributor understands and agrees that by receiving Distributor's financial statements, Company does not guaranty Distributor's financial viability.

        2.     If Company does not offer, or if Distributor does not apply for or accept, credit payment terms, Distributor shall purchase Product on the payment terms set forth in sub-part a. or b. below:

        a)  Distributor shall provide Company with an irrevocable standby Letter of Credit at Distributor's sole cost and expense, issued by a bank and on terms satisfactory to Company. While Distributor may determine the specific sum of money available against presentation of the Letter of Credit, the amount which is available at any time shall operate as a credit limit on the maximum amount of Product which Company will at that time agree to sell to Distributor. Therefore, Distributor understands and agrees that, if Distributor elects to provide a Letter of Credit and desires to purchase quantities of Product costing in excess of the amount of money then-available under the Letter of Credit, Distributor must increase the Letter of Credit. If Distributor elects to provide a Letter of Credit, the Letter of Credit shall remain in full force and effect, available to Company upon presentation of documents required by the bank, for as long as Distributor owes Company any sum for Product sold to Distributor in reliance on the Letter of Credit; or

        b)  Distributor shall pay the cost of Product in full within 3 days after Company communicates its acceptance of Distributor's purchase order.

3.      Unless Distributor posts a Letter of Credit, upon Company's request, Distributor shall utilize electronic fund transfer or comparable electronic methods that eliminates payment by paper check or draft. Distributor shall bear all costs arising from the use of electronic payment methods.

4.      If Distributor accepts credit payment terms and becomes delinquent in payment or otherwise commits a default under this Agreement, Company has no obligation to offer Distributor the opportunity to post a Letter of Credit, pay for future Product orders in advance or any other workout, and may terminate this Agreement based upon Distributor's default in accordance with this Agreement.

5.      Under no condition shall Distributor have any right to set-off from the price of Product any amount, claim, expense, liability, or obligation of any kind, actual or contingent, that Company owes, or that Distributor alleges Company may owe, to Distributor. Without limiting the generality of the foregoing, Distributor may not set-off from the price of Product any sums which Company may owe to Distributor in connection with Distributor's sale of Product to Accounts for which Company provides centralized invoicing and billing services.

6.      Company shall have no obligation to ship Product to Distributor during any time when Distributor is delinquent in payment of any outstanding sums owed to Company or otherwise commits a default under this Agreement.  Company shall not be liable to Distributor or to any Account of Distributor or any other Person due to Company's failure to ship Product for this reason.

C.      Forecasts.  Distributor shall provide Company with monthly non-binding good faith forecasts of its anticipated requirements and shipping dates for the 6 month periods following each such forecast.  Distributor understands that these forecasts are for Company's estimation and planning purposes only and do not constitute a guaranty of future sales or profits or a promise not to exercise Company's right to terminate this Agreement before the end of the forecasted period.

D.      Warranty Disclaimer.

1.      **Schedule E** sets forth a form of FDA continuing guarantee intended to relieve Distributor from responsibility if, through no fault of Distributor, Product sold by Distributor is found to be adulterated or misbranded within the meaning of the Food, Drug and Cosmetic Act.  **EXCEPT AS OTHERWISE SET FORTH IN SCHEDULE E, DISTRIBUTOR UNDERSTANDS AND AGREES THAT COMPANY DISCLAIMS ALL OTHER, AND MAKES NO, EXPRESS OR IMPLIED WARRANTIES CONCERNING PRODUCT, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.**

2.      Distributor is not authorized to extend to any Account or other Person any warranty, whether express or implied, relating to Product and shall indemnify and hold Company free and harmless from any claims brought by any Person resulting from: (i) a warranty or representation made by Distributor not specifically authorized by Company in writing; or (ii) Distributor's failure to effectively disclaim any express or implied warranty concerning Product.  Distributor's indemnity pursuant to this section shall not preclude Company from declaring Distributor in breach of this Agreement and pursuing all remedies available against Distributor under Applicable Law.

IV.     PRODUCT INVENTORY AND HANDLING.

A.      Inventory.  Distributor shall maintain in stock, as inventory, at Distributor's Warehouse, a sufficient quantity of Product to meet reasonably anticipated demand by existing and prospective Accounts in the Territory to ensure the prompt and efficient delivery of Product and avoid out-of-stock conditions.  At a minimum, Distributor shall maintain in stock quantities of Product that are no less than Distributor's aggregate Product sales for the most recent two week period.  In determining inventory requirements, Distributor shall give consideration to normal lead delivery time and recent experiences with shipping and delivery.

{00011497 V1}

B.      Distributor's Warehouse.  At Distributor's sole expense, Distributor shall maintain Distributor's Warehouse as a first-class, secure loading, storage and receiving facility, fit for foodstuffs, in clean and safe condition, with adequate shelf storage to protect the integrity of Product against spoilage, damage, and contamination.

C.      Inspection.  At any time during normal business hours, without prior notice, Company's authorized representatives may enter Distributor's Warehouse to: (i) inspect its condition; (ii) observe the manner in which Distributor handles, rotates and stores Product; (iii) remove or sample Product, without charge to Company; (iv) observe and interview Distributor's employees; (v) take a physical inventory of Product in Distributor's possession and review and copy Distributor's records relating to its Product inventory; and (vi) otherwise evaluate and verify Distributor's compliance with this Agreement.  Distributor hereby unconditionally grants authority to Company's authorized representatives to enter Distributor's Warehouse for the purpose of conducting inspections.

D.      Product Handling.  Distributor shall observe Company's instructions for handling, rotating and storing Product and for maintaining environmental control systems in order to preserve the quality and integrity of Product.  After taking delivery of Product, Distributor shall not alter any Product contents, labels, packaging or containers.

E.      Recalled Product, Withdrawn Product and Recall/Withdrawal Events.

1.      If Company or a governmental authority notifies Distributor of a Recall/Withdrawal Event, Distributor shall immediately comply with Company's instructions or the binding decision of a competent governmental authority and use its best efforts to ensure the swift, safe, and secure return of the Recalled Product or Withdrawn Product in Distributor's possession and in the possession of Accounts in the Territory to a location that Company designates in writing.  Distributor understands and agrees that only Company or a governmental authority has authority to initiate a Recall/Withdrawal Event and Distributor has no authority to do so.  Distributor understands and agrees that, depending on the circumstances, a Recall/Withdrawal Event may involve all Product, a specific line of Product, or specific batches of Product.

2.      Distributor is solely responsible for arranging with its Accounts for the return of unsold Recalled Product and Withdrawn Product in their possession.  Except as provided in this Section, Company shall reimburse Distributor for certain direct costs with respect to the return of Recalled Product and Withdrawn Product limited to the sum of:

a)  The amount which Distributor originally paid to Company to purchase the Recalled Product and Withdrawn Product in question based on the original applicable purchase order;

b)  If Distributor refunds any money to its Accounts in buying back unsold Recalled Product or Withdrawn Product, the difference between: (i) the amount of the refund not to exceed the Account's original purchase price paid for the unsold Recalled Product or Withdrawn Product, and (ii) Distributor's original purchase price paid for the unsold Recalled Product or Withdrawn Product based on the original purchase order; and

c)  Distributor's documented freight, delivery and insurance expenses to return Recalled Product and Withdrawn Product to Company's designated location.

3.      In lieu of returning Recalled Product or Withdrawn Product, Company may instruct Distributor to destroy any Recalled Product or Withdrawn Product in Distributor's custody.  In that case, Distributor shall provide Company with written confirmation of the batch numbers of the Recalled Product or Withdrawn Product which it has destroyed.  Company shall reimburse Distributor for any direct costs that Distributor can substantiate that it incurred to destroy Recalled Product or Withdrawn Product at Company's request.

{00011497 V1}

4.     If any Account brings a claim, demand or action against Distributor arising from, or due to, a Recall/Withdrawal Event, Company agrees to indemnify, defend and hold Distributor free and harmless from the claim, demand or action unless Company can demonstrate that the reason for the Recall/Withdrawal Event is due, directly or indirectly, to Distributor's negligence or willful misconduct or breach of this Agreement, in which case Company shall not be obligated to (i) defend, indemnify or hold Distributor free and harmless from the claim, demand or action, or (ii) reimburse Distributor for any amount pursuant to this Section and may terminate Distributor for breach of this Agreement and pursue all other remedies available against Distributor under Applicable Law.  Except as provided in this Section, Distributor understands and agrees that Company shall not be liable to any Account in the Territory to whom Distributor sold Recalled Product or Withdrawn Product.

5.     If any reimbursement is due to Distributor for Recalled Product or Withdrawn Product pursuant to this Section, Company shall pay the amount to Distributor within 30 days after Distributor: (i) returns or supplies proof of having destroyed the Recalled Product or Withdrawn Product, and (ii) supplies documentation substantiating Distributor's freight, delivery and insurance expenses in connection with the return.  Distributor understands and agrees that: (x) reimbursement of the foregoing amount is Distributor's exclusive remedy and Distributor shall have no other claim or recourse against Company under any legal theory for any direct or indirect costs, damages, expense, liability or claims arising from the purchase, sale or return of Recalled Product or Withdrawn Product; and (y) Company may set-off from the reimbursement payable any monies then due and owing by Distributor to Company under this Agreement.

V.     DISTRIBUTOR'S OBLIGATIONS.  In addition to duties stated elsewhere in this Agreement, Distributor agrees as follows:

A.     Best Efforts.  Distributor shall use its best efforts to: (i) market, promote, distribute, and sell Product to Accounts in the Territory; (ii) increase and maximize sales of Product in the Territory in order to achieve the highest practicable distribution of Product in the Territory; and (iii) faithfully discharge its obligations under this Agreement.  Distributor's best efforts shall include conducting business in a professional and ethical manner and in compliance with Applicable Law.  Distributor shall fairly represent the quality, characteristics, performance capability, and warranty conditions of Product consistent with Company's sales policies.  Distributor shall respond promptly to all inquiries from Accounts and potential Accounts in the Territory.

B.     Maintenance of Good Will.  Distributor shall at all times market, distribute and sell Product in a manner that enhances the reputation, good will, acceptance, and consumer awareness of Product and the Proprietary Marks, and maximizes sales of Product, and shall take no action, nor permit any action to be taken, that is or may be detrimental to the reputation and good will of Company or Product, or that would adversely affect sales of Product.

C.     Changes in Executive Management and Owners.  On or before Distributor's execution of this Agreement, Distributor shall complete all of the information required by **Schedule G** in order to identify for Company's benefit the following Persons as of the Effective Date: (i) the individuals comprising Distributor's Executive Management; (ii) Distributor's Affiliates; and (iii) all Persons owning a legal or beneficial interest in Distributor or Distributor's Affiliates.  During the Term, Distributor shall notify Company immediately in writing of any contemplated, proposed or actual change in the information set forth on **Schedule G**.  Distributor understands and agrees that the duty to give notice of any contemplated, proposed or actual change in the information set forth on **Schedule G** is in addition to, not in lieu of, the duty to obtain Company's prior written consent to an Event of Transfer in accordance with the provisions of this Agreement.

D.     No Commitments.  Distributor shall not make or purport to make any representation, warranty, covenant or commitment intended to be binding on Company, whether express or implied.

E.     Account Support.

1.     Distributor shall use its best efforts to maintain ongoing contact with all existing and prospective Accounts for purpose of gathering market information for Company, generating sales, communicating Product and marketing information, and establishing, enhancing and maintaining good will for Product and

{00011497 V1}

-11-

Company. Distributor's best efforts shall include causing technically and personally suitable employees to call regularly and frequently upon existing and prospective Accounts in the Territory.

2. Distributor shall provide each Account with appropriate instructions on the proper storage and handling of Product on an ongoing basis. Distributor shall not, under any circumstances, provide instructions, advice, or recommendations to existing or prospective Accounts or ultimate consumers of Product regarding the storage or handling of Product that in any way conflicts with or contradicts the instructions or information provided by Company or furnished with Product from time to time. Distributor shall perform quality control practices in the Territory to ensure the proper handling of Product by Accounts.

3. If Company deems it necessary, Distributor agrees to execute promptly any appropriate document or grant any power of attorney to Company or Company's designee in order to allow Company to directly pursue all remedies permitted under Applicable Law against any Account as a result of the Account's non-compliance with obligations which the Account owes to Distributor regarding the Account's right to sell Product or use RED BULL Product Advertising or RED BULL Display Equipment.

F.    Employees.

1. Distributor shall employ a sufficient number of qualified and competent employees to ensure the efficient, effective, courteous and knowledgeable marketing, distribution, sale and delivery of Product in accordance with Company's merchandising methods and policies requiring use of a dedicated sales team. Distributor is solely responsible for hiring, firing, training and establishing employment policies applicable to its employees, and understands and agrees that this Agreement does not impose any controls, or otherwise impinge, on Distributor's discretion to make all employment-related decisions.

2. Distributor's day-to-day activities shall at all times be under the direct, personal supervision of at least one General Manager. Distributor's General Manager shall be responsible for providing initial and continuing training, in accordance with Company's instructions issued from time to time, to Distributor's other employees at a level appropriate to the employee's duties, including, without limitation, to Distributor's other management-level employees.

3. This Agreement shall not be construed to imply any employment relationship between Company and Distributor or Distributor's personnel, employees, or any independent contractor hired by Distributor. Distributor hereby assumes all obligations and responsibilities with respect to its personnel, employees and independent contractors under Applicable Law. Distributor shall be solely responsible for complying with all obligations that Applicable Law imposes on employers. Without limiting the scope of Distributor's obligations, Distributor shall comply for example and without limitation, with laws concerning salaries, wages, benefits and withholding taxes.

G.    Local Advertisements.

1. Distributor shall not use, disseminate, broadcast or publish any Local Advertisements, or authorize others to do so, directly or indirectly, without Company's prior written approval. Company shall have 15 days after Distributor submits a transcript, copy or sample of the Local Advertisement and Distributor's intended marketing plan in which to notify Distributor of its approval or disapproval, and Company's failure to timely respond shall signify Company's disapproval. Company may withdraw its approval of any Local Advertisement upon 30 days notice.

2. Distributor understands and agrees that regional or national sales and marketing programs may include, for example and without limitation, distribution of Product in special packaging, "buy one and get one free" promotions, "__$ off the wholesale price" or similar types of promotional activities. Distributor shall cooperate with, and participate in, regional or national sales or marketing programs covering the Territory that Company may, from time to time organize or sponsor. The duty imposed on Distributor to participate in regional or national sales or marketing programs shall not: (i) require Distributor to make any payment to Company except the

{00011497 V1}

-12-

bona fide wholesale prices of Product as provided in this Agreement; or (ii) require Distributor to purchase quantities of Product that exceed the amount that a reasonably prudent distributor would purchase in order to meet reasonably anticipated demand by existing and prospective customers in order to ensure the prompt and efficient delivery of Product and avoid out-of-stock conditions..

    H.      Notification of Problems.

        1.      Distributor shall immediately: (i) inform Company of any problems encountered with Product, and (ii) forward to Company any and all complaints or demands from Accounts, ultimate consumers of Product, government agencies, or other Persons involving problems encountered with Product which Distributor learns about so that Company may take the action that it deems appropriate, including taking no action.

        2.      Distributor shall use, and instruct its employees and agents to use, due care to observe the trade practices of Accounts to assist Company to monitor against conduct that is, or might constitute or become, an Intellectual Property Claim.  Distributor shall immediately notify Company of any conduct which Distributor believes, or suspects, may constitute or become an Intellectual Property Claim.

    I.      Records and Reporting Requirements.

        1.      During the Term, Distributor shall maintain full, complete and accurate business records documenting: (i) sales, service calls and deliveries; (ii) inventory reports; (iii) names and addresses of Accounts; (iv) marketing business plans and results; (v) Distributor's use and depletion of RED BULL Product Advertising and RED BULL Display Equipment; (vii) Distributor's daily Product depletions (which shall be electronically provided to Company on a daily basis); (viii) monthly reports of the location and use of all Red Bull branded coolers in the Territory; and (ix) such other financial data and statistical information as Company may request for purposes of internal operational control, marketing purposes and to monitor Distributor's compliance with this Agreement. Distributor shall provide Company with any of the information above, upon Company's reasonable request.

        During the Term, upon written request from Company, Distributor shall submit financial statements consisting of a profit and loss statement, balance sheet, and related statements of cash flow and income, which shall be: (i) compiled, reviewed or audited by an independent certified public accountant and certified to be true by Distributor's Principal; (ii) fairly and accurately reflect the financial condition of Distributor's business as of the end of the period for which they are prepared and the results of operations for that period; and (iii) prepared in accordance with generally accepted accounting principles.  Company shall be entitled to request financial reports at least every 6 months during the Term.

        2.      At Company's request, Distributor shall: (x) timely complete Company's operational and statistical control forms to enable Company to develop Product statistics and demographic data, research new products, goods, services and marketing programs and respond to competitive and market changes and shall submit copies of such reports and records to Company upon request as Company may direct, and (y) provide Company with a true and correct list of the names and addresses of all Accounts that have purchased Product from Distributor during the period specified in Company's request.

        3.      At any time, and from time to time during regular business hours, upon reasonable prior notice, Company or its authorized representatives may inspect and copy Distributor's books and records at Company's expense in order to verify Distributor's compliance with this Agreement.

    J.      Insurance.

        1.      During the Term, Distributor shall, at its sole cost and expense, maintain in force policies of insurance that are customarily carried by independent beverage distributors and, in addition, any insurance policies specified by Company, including, without limitation, commercial general liability, automobile liability, property damage, products liability, and worker's compensation and other types of insurance if required by Applicable Law.  All insurance policies that Distributor carries shall: (i) be written by insurance companies of

{00011497 V1}

-13-

recognized responsibility satisfactory to Company in its reasonable discretion; (ii) name Company as an additional insured (unless forbidden by Applicable Law); and (iii) state that the policy will not be canceled or altered without at least 30 days prior written notice to Company. Distributor shall provide Company with certificates of insurance and evidence of payment of premiums verifying Distributor's compliance with this Agreement within 10 days after the Effective Date, and, thereafter, during the Term, from time to time, within 10 days after Company requests the certificates or evidence.

       2.    The coverage of Distributor's insurance policies shall be in amounts customary for independent beverage distributors. Company may specify the minimum coverage and deductible limits for each required insurance policy and may, from time to time, increase the minimum insurance requirements, establish and change deductible limits, require that Distributor procure and maintain additional forms of insurance, and otherwise modify its minimum insurance requirements based upon inflation, general industry standards, Company's experience with claims, or for other commercially reasonable reasons. Distributor shall comply with any change imposed by Company within 30 days after written notice from Company and shall submit written proof of compliance to Company upon request.

       3.    Nothing in this Agreement shall require that Distributor make any payment to Company to obtain or maintain required insurance.

       4.    Maintenance of required insurance shall not relieve Distributor of liability under the indemnity provisions of this Agreement.

       5.    All required insurance policies shall expressly prohibit the insurer, in the event of an insured loss, from salvaging, or claiming custody of, Product for any purpose, regardless of condition, except with Company's prior written consent.

       6.    Distributor shall cause each policy of insurance required by this Agreement to include a waiver of subrogation, which shall provide that Distributor and Company each releases and relieves the other, and each waives its entire right to recover damages, in contract, tort and otherwise, against the other for any loss or damage occurring to Distributor's property to the extent the loss is covered by insurance.

       7.    Distributor understands and agrees that the minimum insurance requirements set forth in this Agreement do not constitute a representation or warranty by Company that the minimum coverage and specified types of insurance will cover the full value of any insured loss. Distributor understands and agrees that it is solely responsible for investigating its insurance needs and determining if it requires higher coverage limits or other types of insurance protection.

VI.    COMPANY'S ASSISTANCE. As long as Distributor is in good standing under this Agreement, Company shall provide the following services:

    A.    Assistance. Upon request, Company shall provide Distributor with consultation and advice in response to Distributor's inquiries about specific administrative, sales, marketing, or operating matters that Distributor brings to Company's attention. Company shall have absolute discretion to determine the method for communicating the consultation or advice, which may differ from the methods used for other distributors and the nature and scope of the assistance.

    B.    Brand Training.

       1.    Company may, in its discretion, require that Distributor's Principal and General Manager (when different individuals) complete any specific Brand Training program before Distributor may take delivery of its first order of Product. During the Term, Company may additionally designate that Distributor's Principal and General Manager, or other specific individuals in Distributor's organization, complete periodic Brand Training programs that Company may, from time to time, offer to address recent developments, new marketing programs, Distributor's performance since the last Brand Training program, and other relevant topics. Subject to space

{00011497 V1}

-14-

availability, Distributor may send additional personnel to the same Brand Training programs that Distributor's Principal and General Manager attend.

2.      If Company elects to provide Brand Training, Company shall determine the length of, and place for, Brand Training.  Company may, in its sole discretion, hold Brand Training at Company's Headquarters, at Distributor's Warehouse, as field training in the Territory, or at other suitable locations within or outside of the United States.  Distributor understands and agrees that: (i) it is solely responsible for all personal expenses that it and its staff incur to attend Brand Training during the Term; and (ii) nothing in this Agreement shall require Distributor to make any payment to Company to attend, or in connection with, any Brand Training program.

C.      Red Bull Product Advertising.  During the Term, Company may, but shall not be obligated to: (i) provide Distributor with RED BULL Product Advertising and specifications for its use free of charge, or (ii) make arrangements with designated third parties to supply Distributor with RED BULL Product Advertising.

1.      If Company elects to provide Distributor with any RED BULL Product Advertising, Company shall determine the quantity of each item of RED BULL Product Advertising that it will provide to Distributor, which may differ from the quantity that Company gives to other authorized distributors and may take into account, among other facts, the size of Distributor's Territory, number of existing Accounts and Company's then-current merchandising standards.  Company shall retain ownership of all RED BULL Product Advertising that Company directly supplies to Distributor even if Distributor places the RED BULL Product Advertising in the custody of an Account.

a)      Nothing in this Agreement shall require Distributor to make any payment to Company for any RED BULL Product Advertising that Company elects to provide.

b)      At any time and for any reason, Company may, in its sole discretion: (i) modify and expand the items that it includes as RED BULL Product Advertising, in which case Company may provide Distributor with a supply of new items; (ii) discontinue the use of any item of RED BULL Product Advertising, in which case, upon notice from Company, Distributor shall immediately cease using the item; and (iii) modify its specifications for the use of RED BULL Product Advertising, in which case Distributor shall immediately implement all changes at its expense.

2.      Company may arrange with one or more designated third party suppliers not related to Company to offer to sell to Distributor designated RED BULL Product Advertising to enable Distributor to market Product in accordance with Company's merchandising standards.

a)      Distributor shall make its own arrangements if Distributor desires to purchase RED BULL Product Advertising from the designated third party supplier.  Company makes no representation or warranty as to the third party supplier's ability to meet Distributor's needs.

b)      Company shall have no responsibility for setting the price, payment terms or other conditions for the supply of RED BULL Product Advertising to Distributor.  All of these matters shall be determined by the third party supplier and Distributor.

3.      Distributor shall not copy, modify, amend, reproduce, or create derivative works from any item of RED BULL Product Advertising regardless of its source.

4.      Distributor shall use due care in handling RED BULL Product Advertising and keep all RED BULL Product Advertising in good condition, ordinary wear and tear excepted.  When not in use, Distributor shall keep any RED BULL Product Advertising in its possession in a safe and locked receptacle in order to prevent theft and unauthorized use.

{00011497 V1}

-15-

5.      If Distributor places any RED BULL Product Advertising in the custody of any Account, Distributor shall be solely responsible for ensuring that: (i) the Account does not alter the RED BULL Product Advertising; (ii) the Account uses the RED BULL Product Advertising solely to promote the sale of Product by the Account; (iii) the Account uses only a current version of RED BULL Product Advertising; (iv) the RED BULL Product Advertising remains in good condition and repair, ordinary wear and tear excepted; and (v) the Account does not sell or otherwise dispose of the RED BULL Product Advertising.  Distributor shall indemnify and hold Company free and harmless from any third party claims arising from the misuse of RED BULL Product Advertising by any Account.

6.      Distributor shall not sell or otherwise dispose of any RED BULL Product Advertising or otherwise knowingly permit RED BULL Product Advertising to be sold or otherwise disposed of by any Account or Person or used by any Account or Person for any purpose not permitted by this Agreement.

7.      While this Agreement does not obligate Distributor to purchase any minimum quantity of designated RED BULL Product Advertising, Distributor understands and agrees that it does have an obligation to carry on Company's marketing programs vigorously in the Territory in accordance with Company's merchandising standards.  The duty to carry on Company's marketing programs vigorously includes, without limitation, placing any RED BULL Product Advertising that Distributor chooses to purchase or which Company chooses to provide to Distributor with Accounts in the Territory and advising Accounts on how to use RED BULL Product Advertising to maximize its visibility to the public.

D.      RED BULL Display Equipment.

1.      Company may arrange with one or more manufacturers or third party suppliers not related to Company to offer to sell or lease to Distributor certain designated RED BULL Display Equipment.

a)      Distributor shall make its own arrangements if Distributor desires to purchase or lease RED BULL Display Equipment from a manufacturer or third party supplier designated by Company as a source of supply.  Company makes no representation or warranty as to the third party supplier's ability to meet Distributor's needs.

b)  Company shall have no responsibility for setting the price, payment terms or other conditions for the sale or lease of RED BULL Display Equipment to Distributor.  All of these matters shall be determined by the third party manufacturer or supplier and Distributor.

c)  No third party manufacturer or supplier of RED BULL Display Equipment shall be Company's Affiliate.  Company shall not receive any payment from a third party manufacturer or supplier for the right to sell or lease RED BULL Display Equipment to Distributor.

2.      Company may make available for Distributor's use during all, or part, of the Term designated RED BULL Display Equipment which Company may own or lease; provided, however, nothing in this Agreement shall: (i) obligate Company to provide Distributor with the use of any RED BULL Display Equipment, or (ii) require Distributor to make any payment to Company for the use of any RED BULL Display Equipment which Company elects to provide to Distributor during the Term.  Company shall retain ownership of all items of RED BULL Display Equipment that Company owns or leases and permits Distributor to use.

3.      Regardless of whether Company or a third party manufacturer or supplier is the source of RED BULL Display Equipment, Distributor shall use all RED BULL Display Equipment in accordance with the requirements of this Agreement, which include, without limitation, the following:

a)      Distributor may place RED BULL Display Equipment only in the custody of Accounts in the Territory that enter into a Terms of Use Agreement.  Upon Company's

{00011497 V1}

-16-

request, Distributor shall furnish Company with a copy of the executed Terms of Use Agreements entered into by Distributor and Accounts.  Distributor shall not place RED BULL Display Equipment in the custody of any other Person or allow any other Person to use RED BULL Display Equipment.  Nothing in this Agreement, or in the Terms of Use Agreement, shall require the Account to make any payment to Company for the use of the RED BULL Display Equipment.

b)      Distributor shall use its best efforts to police and inspect the use of RED BULL Display Equipment by Accounts in the Territory on a regular basis to verify the Account's compliance with the Terms of Use Agreement.

c)      Except to the extent otherwise provided in any lease of RED BULL Display Equipment entered into by Distributor and a designated third party manufacturer or supplier, at Distributor's sole expense, Distributor shall: (i) use due care in handling RED BULL Display Equipment and not place, or permit an Account to place, RED BULL Display Equipment in a section of the Account's premises where Distributor knows, or should know, the RED BULL Display Equipment could become damaged; and (ii) maintain any RED BULL Display Equipment in Distributor's possession, or in the possession of an Account, in good condition and repair, ordinary wear and tear excepted, including, without limitation, performing normal servicing and repairs in accordance with manufacturer recommendations.

d)      Distributor shall display on the RED BULL Display Equipment in Distributor's possession only the Proprietary Marks which Company may, from time to time, designate, and shall not display other trademarks, service marks, trade names, words, designs, graphics, 3-dimensional objects, symbols, logos, or other identifications mark or commercial symbol of any kind.

e)      Distributor shall use RED BULL Display Equipment only to store and display Product, and shall not use RED BULL Display Equipment to store or display any other item or for any other purpose.

4.      At any time, effective upon 30 days notice to Distributor, Company may change the features of RED BULL Display Equipment or add or delete specific models of RED BULL Display Equipment. Company may change the instructions for using RED BULL Display Equipment or the Proprietary Marks required to appear on RED BULL Display Equipment at any time effective upon notice to Distributor.  Distributor shall comply with all requirements and modifications at its sole expense and cease using any discontinued models in accordance with Company's instructions.

5.      Distributor shall not sell or otherwise dispose of any RED BULL Display Equipment or otherwise knowingly permit RED BULL Display Equipment to be sold or otherwise disposed of by any Account or Person or used by any Account or Person for any purpose not permitted by this Agreement.

6.      While this Agreement does not obligate Distributor to purchase any minimum quantity of RED BULL Display Equipment, Distributor understands and agrees that it does have an obligation to carry on Company's marketing programs vigorously in the Territory in accordance with Company's merchandising standards.  The duty to carry on Company's marketing programs vigorously includes, without limitation, placing any RED BULL Display Equipment that Distributor chooses to purchase or lease, or which Company provides or arranges with a third party supplier to provide, to Distributor with Accounts in the Territory and advising Accounts on how to use RED BULL Display Equipment to maximize the visibility of Product to the public.

{00011497 V1}

VII.     PROPRIETARY MARKS AND CONFIDENTIAL INFORMATION. Company hereby grants Distributor, and Distributor accepts, the limited, non-exclusive right to use the Proprietary Marks and any Confidential Information, subject to the terms and conditions set forth in **Schedule D**.

VIII.    TERM AND TERMINATION.

   A.     Term. Distributor's appointment shall be limited to the Term of this Agreement; provided, however, Distributor shall be obligated to perform the duties set forth in this Agreement that expressly, or by their nature, require Distributor's performance after the Term ends.

   B.     Termination Without Cause.

     1.     The parties hereby wish to acknowledge and reaffirm their intention to create an "at-will" relationship. The parties furthermore acknowledge and agree that: (i) the Term of this Agreement is not for a fixed period, or minimum period, of time, and (ii) at any time either party may terminate this Agreement without cause in accordance with the procedures in this Section. Each party hereby accepts the risk that the other party may terminate this Agreement at any time without cause in accordance with this section.

     INITIAL HERE:  _____ Distributor  _____ Company

     2.     If a party desires to terminate this Agreement without cause, the party shall give written notice to the other party, in which case this Agreement shall automatically terminate 30 days after written notice is given. Neither party shall be liable to the other for any losses, damages, costs or expenses resulting from a termination without cause.

   C.     Termination With Cause. Company may terminate this Agreement, in its sole discretion and election, effective immediately upon Company's delivery of written notice of termination to Distributor based on any of the events set forth in this subparagraph C. If Company terminates this Agreement pursuant to this subparagraph C., Company's written notice of termination shall specify the event or events upon which Company bases termination. Distributor shall have no opportunity to cure a termination based on any of the events described in this subparagraph C, which are:

     1.     If Distributor fails or refuses to pay any invoice on or before the date due, and should the default continue for a period of 7 days after written notice of default is given by Company to Distributor.

     2.     If Distributor fails or refuses to submit any report or operating information in accordance with the requirements of this Agreement, and should the default continue for a period of 15 days after written notice of default is given by Company to Distributor.

     3.     If Distributor loses the right for any period to occupy Distributor's Warehouse leaving no facility in the Territory at which Distributor receives and ships Product and maintains inventory.

     4.     If Distributor is insolvent as that term is defined or construed under Applicable Law, or if Distributor makes any general arrangement or assignment for the benefit of creditors or becomes a debtor as that term is defined in 11 U.S.C. § 101 et seq., or any successor statute, unless, in the case where a petition is filed against Distributor, Distributor obtains an order dismissing the proceeding within 60 days after the petition is filed; or if a trustee or receiver be appointed to take possession of all, or substantially all, of Distributor's assets, unless possession of the assets is restored to Distributor within 30 days after the appointment; or if all, or substantially all, of Distributor's assets or the distribution rights granted by this Agreement are subject to an order of attachment, execution or other judicial seizure, unless the order or seizure is discharged within 30 days following issuance.

     5.     If Distributor, or any duly authorized representative of Distributor, makes a material misrepresentation or omission in obtaining the distribution rights granted hereunder, or if Distributor, or any officer, member of the board of directors, shareholder, member, manager, or general partner of Distributor, is convicted of

{00011497 V1}

-18-

or pleads no contest to a felony charge or engages in any conduct or practice that, in Company's judgment, reflects unfavorably upon or is detrimental or harmful to the good name, goodwill or reputation of Company, Product or the Proprietary Marks.

6.      If Distributor engages in any material misrepresentation or fraudulent conduct in its dealings with Accounts which, in Company's opinion, reflects unfavorably upon or is detrimental or harmful to the good name, goodwill or reputation of Company, Product or the Proprietary Marks.

7.      If Distributor abandons, or fails or refuses to actively carry on its duties under this Agreement for 5 continuous days, or for any shorter period under circumstances that make it reasonable for Company to conclude that Distributor does not intend to continue to market, distribute, or sell Product or fulfill its other duties under this Agreement, unless Distributor obtains Company's written consent to cease regular activities for a specified period of time before Distributor ceases regular activities.

8.      If Distributor makes, or attempts to make, an unauthorized transfer in violation of this Agreement; if an order is made or resolution passed for the winding-up or the liquidation of Distributor (if Distributor is a corporation, LLC, partnership or other business entity); or if Distributor adopts or takes any action for its dissolution or liquidation.

9.      If Distributor receives, during any consecutive 24 month period, 3 or more notices of default of this Agreement (whether or not the notices relate to the same or to different defaults and whether or not the defaults are timely cured by Distributor).

10.      If Distributor makes any unauthorized use, publication, duplication or disclosure of any Confidential Information, or if any Person required by this Agreement to execute a Confidentiality, Non-Disclosure and Non-Competition Agreement with Company or Distributor breaches the Confidentiality, Non-Disclosure and Non-Competition Agreement.

11.      If Distributor misuses or makes an unauthorized use of the Proprietary Marks.

12.      If Distributor directly or indirectly sells, or attempts to sell, Product to an Account that is not in the Territory or ships or transfers Product at the request of an Account in the Territory to a location outside of the Territory.

13.      If Distributor commits any other act which, in Company's sole judgment, does, or can be expected to, materially impair the goodwill or reputation associated with the Proprietary Marks or the Company.

14.      If Distributor fails to comply with any violation of Applicable Law within 10 days after being notified of non-compliance.

15.      If Distributor fails to maintain the minimum number of Van Sales Teams required by Company.

16.      If Distributor otherwise breaches, or refuses to fulfill or perform, any other obligations under this Agreement which breach or refusal continues for 30 days after Company gives Distributor written notice of default specifying the grounds of default and an opportunity to cure the default within the 30 day cure period.

17.      If Company decides, in its sole discretion, to: (i) discontinue distributing Product in the United States or in all or a substantial portion of the geographic market where the Territory is located; or (ii) sell, convey, merge or otherwise transfer all, or a substantial portion of, the part(s) of its business that is/are responsible for distributing Product in the United States.

18.      If Company decides to change the manner in which it distributes Product in the United States due to changes in Applicable Law or government enforcement or regulation since the Effective Date which,

{00011497 V1}

-19-

in Company's sole judgment, will adversely affect: (i) claims that Company may lawfully make about Product; (ii) Product's classification as a non-alcoholic beverage; (iii) the use of ingredients in Product formulae; (iv) other legal requirements applicable to the offer or sale of Product in the United States; or (v) Company's ability to produce, market, advertise, promote, distribute or sell Product in the United States competitively.

        D.    <u>Validity</u>. In any proceeding in which the validity of termination of this Agreement is at issue, Company shall not be limited to the reasons set forth in any notice of termination or default given to Distributor.

IX.    <u>RIGHTS AND OBLIGATIONS ON TERMINATION</u>. Upon termination of this Agreement by either party, the parties shall have the following rights and obligations:

        A.    <u>Proprietary Marks, Confidential Information</u>. Distributor shall immediately, and permanently, remove and cease using, in any manner whatsoever, the Proprietary Marks and Confidential Information, and shall refrain from doing any act which suggests or implies that Distributor is, or was, an authorized Product distributor. Distributor shall cancel all advertising and promotional activities which associate Distributor with Product or Company. Distributor shall keep all Confidential Information in confidence and not use or disclose it to any third party. Continued use by Distributor of any of the Proprietary Marks or Confidential Information shall constitute willful trademark infringement and unfair competition by Distributor.

        B.    <u>Return of Property</u>.

        1.    Distributor shall immediately deliver to Company, at Distributor's sole expense, and without compensation or reimbursement to Distributor: (i) all written or electronic materials constituting Confidential Information, and (ii) a true and correct list of the names and addresses of all Accounts that have purchased Product from Distributor during the 6 months before termination of this Agreement.

        2.    With respect to RED BULL Product Advertising:

        a)    Distributor shall supply Company with the name of all Accounts in whose custody Distributor has placed RED BULL Product Advertising before termination of this Agreement.

        b)    If Company has provided Distributor with RED BULL Product Advertising for Distributor's use during the Term, Distributor shall immediately return the RED BULL Product Advertising to Company that Distributor has placed with an Account or that is in Distributor's possession, in good condition and repair, ordinary wear and tear excepted, unless Company specifically directs Distributor not to remove RED BULL Product Advertising placed with a particular Account. Distributor shall bear all expenses for freight, delivery and insurance to deliver the RED BULL Product Advertising to Company's designated location.

        c)    With respect to RED BULL Product Advertising that Distributor has obtained from a third party supplier, Company, for itself or through one or more designees, shall have the option, but not the obligation, to acquire good and marketable title in and to any or all of the RED BULL Product Advertising in good condition and repair that is in Distributor's possession or which has been placed with an Account, free of liens and encumbrances.

        d)    If Company exercises its option to acquire all, or certain, RED BULL Product Advertising for which Distributor has paid money to the third party supplier, Company shall pay Distributor an amount equal to Distributor's book value for the RED BULL Product Advertising, less the set-offs permitted by this Agreement.

e)      If Distributor has not paid the third party supplier any money for the RED BULL Product Advertising, Distributor shall assign all of its right, title and interest in and to the RED BULL Product Advertising, without compensation, to Company.

f)      Distributor understands and agrees that Distributor's continued use, disposal or sale of any RED BULL Product Advertising in its possession or in the custody of any Account after termination of this Agreement, regardless of whether Distributor has acquired the RED BULL Product Advertising from a third party supplier or obtained it from Company, shall constitute willful trademark infringement, copyright infringement, and unfair competition by Distributor.

3.      With respect to any RED BULL Display Equipment which Company owns or leases and has allowed Distributor to use during the Term, termination of this Agreement shall result in the following consequences:

a)      With respect to any RED BULL Display Equipment in Distributor's possession, Distributor shall bear all costs for freight, delivery and insurance to safely package, ship and immediately return the RED BULL Display Equipment to Company's designated location, in good condition and repair, ordinary wear and tear excepted.

b)      With respect to RED BULL Display Equipment which is in the custody of an Account, unless Company's notice of termination expressly states Company's election to assume Distributor's rights and obligations under one or more specific Terms of Use Agreements, all Terms of Use Agreements which Company does not expressly assume shall terminate effective concurrently upon termination of this Agreement.

c)      With respect to any Terms of Use Agreement that Company elects to assume from Distributor, Distributor shall execute such documents as Company may reasonably require to establish Distributor's assignment, and the assumption by Company or Company's designee, of Distributor's rights and obligations under the Terms of Use Agreement.

d)      With respect to any terminated Terms of Use Agreement, Distributor shall immediately remove the RED BULL Display Equipment from the Account and bear all costs for freight, delivery and insurance to safely package, ship and immediately return the RED BULL Display Equipment to the address that Company designates, in good condition and repair, ordinary wear and tear excepted.  If Distributor fails to comply with the foregoing obligation, Company may remove RED BULL Display Equipment from the premises of any Account and set off its expenses from any monies that Company then may owe to Distributor under this Agreement.

4.      With respect to RED BULL Display Equipment which Distributor owns or leases from a third party, termination of this Agreement shall result in the following consequences:

a)      Company, for itself or through one or more designees, shall have the option, but not the obligation, to: (i) purchase from Distributor good and marketable title in and to any or all of the RED BULL Display Equipment that Distributor owns, free of liens and encumbrances, at Distributor's book value; and (ii) assume all of Distributor's rights and obligations under any, or all, leases entered into by Distributor and a third party for the use of RED BULL Display Equipment.  Company's notice of termination shall specify if, and how, Company exercises its option with respect to all, or specific, RED BULL Display Equipment.

{00011497 V1}

-21-

b)       If Company exercises the option to purchase RED BULL Display Equipment from Distributor, Distributor shall have 5 days after receipt of Company's notice in which to present Company, or Company's designee, with documentation to substantiate the then-current book value of the items of RED BULL Display Equipment selected for purchase.  Within 5 days after presentation of documentation, Company, or Company's designee, shall deliver the purchase price to Distributor and Distributor shall concurrently deliver to Company, or Company's designee, a bill of sale for, and possession of, the RED BULL Display Equipment so purchased.

c)       If Company exercises the option to assume in its own name, or in the name of Company's designee, all of Distributor's rights and obligations under one or more leases, Distributor shall have 5 days after receipt of Company's notice in which to present Company, or Company's designee, with documentation, if required by the lease, establishing the third party's consent to the assignment and assumption of the lease, and to deliver possession of the RED BULL Display Equipment to Company or Company's designee.

d)       Distributor shall bear all costs for freight, delivery and insurance to deliver to Company, or to Company's designee (or, if more than one buyer or assignee is involved, to each designee), the RED BULL Display Equipment that is the subject of Company's election.  Distributor understands and agrees that Company may set off from the purchase price of any RED BULL Display Equipment that Company, or Company's designee, elects to buy from Distributor: (i) any monies then due and owing by Distributor to Company under this Agreement, and (ii) the cost to repair any RED BULL Display Equipment being sold or assigned to the extent that the RED BULL Display Equipment is not in good condition and repair, ordinary wear and tear excepted, at the time Company, or Company's designee, takes possession.

5.       Before making any payment to Distributor pursuant to this Paragraph IX.B., Company may inspect the property in Distributor's possession or in the custody of an Account to determine the property's condition and any necessary repairs in order to determine the amount of any permitted set-off.

C.       <u>Delivery Vehicles</u>.  Upon termination of this Agreement, Distributor shall remove from any delivery vehicles which Distributor then owns or leases, and uses to deliver Product anything displaying the Proprietary Marks or other features that identify the vehicle with Company or Product.

D.       <u>Product</u>.

1.       Company shall be relieved from any obligation to make any further shipments of Product and may cancel all of Distributor's unshipped orders of Product, irrespective of previous acceptance by Company, except for Product that Distributor proves to Company's satisfaction has been sold by Distributor before Distributor's receipt of notice of termination.  Company shall have no obligation to existing or prospective Accounts on account of such cancellation.  The sale or shipment of Product to Distributor or any other act after termination of this Agreement shall not constitute a waiver of the termination or any other rights of Company under Applicable Law.

2.       Company shall repurchase from Distributor, at Distributor's actual landed cost, Distributor's entire inventory of Product in saleable condition that has not been sold by Distributor before the effective date of termination; provided, however, Company may set-off from the purchase price any monies then due and owing by Distributor to Company under this Agreement.  Distributor shall immediately ready its inventory of unsold salable Product so that Company may arrange to pick up all unsold salable Product at one location, which shall be at Distributor's Warehouse.  Company shall have 14 days after this Agreement terminates in which to remove the inventory from Distributor's Warehouse, during which time Distributor shall continue to handle and store the inventory in accordance with Company's instructions at Distributor's expense.  Company shall pay

{00011497 V1}

Distributor the purchase price for the inventory when Company removes the inventory from Distributor's Warehouse.

E.     Obligations.  All obligations of Distributor which otherwise are not due shall become immediately due and payable on the effective date of termination without presentment, demand, protest or notice of any kind, all of which are waived by Distributor.  Company may set-off from any sums which Company may owe to Distributor the full amount then due and owing by Distributor to Company under this Agreement.

F.     No Relief.  Neither party, by reason of the termination of this Agreement with cause or without cause shall be liable to the other for compensation or damages on account of present or prospective profits on sales or anticipated sales or on account of expenditures, investments or commitments made pursuant to this Agreement or in establishing, developing or maintaining the goodwill or reputation of Product or the Proprietary Marks.  Except for the foregoing sentence, nothing in this Agreement shall limit a party's remedies, or right to recover all damages, under Applicable Law caused by the other party's breach of this Agreement.

G.     Inspection.  All rights of inspection set forth in this Agreement shall survive termination or Distributor's transfer of this Agreement.

X.     TRANSFER.

A.     Transfer Restrictions.  Distributor understands and agrees that the rights granted to it are personal and are granted in reliance upon, among other considerations, the individual or collective character, skill, aptitude, attitude, experience, business ability and financial condition and capacity of Distributor, each Distributor Affiliate, and Distributor's Executive Management.  Distributor shall not, directly or indirectly, attempt or commit an Event of Transfer, or otherwise delegate its duties or obligations under this Agreement, either by operation of law or in any other manner, without Company's prior written consent, which may be withheld in its sole discretion.  Distributor understands and agrees that Company has the right to do business with Persons of its own choosing and has complete discretion to approve any prospective transferee and to condition its approval upon the satisfaction of specific conditions.  Distributor further understands and agrees that any act that any actual, or attempted, Event of Transfer or other type of delegation of obligations or duties shall be null and void and shall constitute a material breach of this Agreement.

B.     Events of Transfer.  For purposes of this Agreement, each of the following is an "Event of Transfer:"

1.     The sale, assignment or transfer of all, or substantially all, of: (i) the assets of Distributor or any Distributor Affiliate; or (ii) Distributor's assets that are material to the Distributor's distribution of Product;

2.     The sale, assignment or transfer of Distributor's rights, or the delegation of Distributor's obligations or duties, under this Agreement to any Person.

3.     If Distributor is an individual, an order dissolving Distributor's marriage or Distributor's death or Incapacity.

4.     Any change in Distributor's Executive Management regardless of the cause of the change, whether for cause, voluntary resignation, death, Incapacity, or otherwise.

5.     The sale, assignment, transfer, pledge, donation, encumbrance or other alienation of any interest in the equity or voting interests of Distributor or any Distributor Affiliate for any reason, whether due to consolidation, merger, issuance of new equity or voting interests, or otherwise.

6.     A financial restructuring or recapitalization by Distributor secured by any, or all, of the equity or voting interests of Distributor or all or substantially all of the assets of Distributor's business.

{00011497 V1}

-23-

7.      The transfer of any interest in this Agreement or in the equity or voting interests of Distributor or any Distributor Affiliate to a trust of any kind.

8.      If Distributor is an individual, the transfer by Distributor of its right, title and interest under this Agreement to a newly-formed business entity unless Distributor is the sole owner of the new entity. Distributor shall provide Company with written notice of the formation of a new entity in accordance with this provision and, upon Company's request, a copy of the new entity's organizational documents and proof of Distributor's sole ownership.

9.      The offer or sale of securities of Distributor or any Distributor Affiliate pursuant to a transaction subject to registration under federal or state securities laws or by private placement pursuant to a written offering memorandum.

XI.     <u>DISPUTE RESOLUTION</u>.  The parties hereby adopt, and agree to submit to, the dispute resolution terms and conditions set forth in **Schedule F**.

XII.    <u>DISTRIBUTOR'S COVENANTS</u>.  To induce Company to enter into this Agreement, Distributor understands and agrees and represents to Company each of the following:

A.      <u>Authority</u>.  If Distributor is a business entity, Distributor represents that it is duly organized and existing under the laws of the state identified on **Schedule G**; is duly certified to do business in the Territory; has all necessary power and legal authority to enter into and perform its obligations under this Agreement; and the person executing this Agreement on Distributor's behalf has the authority to bind Distributor to this Agreement and that authority has not been modified, limited or revoked.

B.      <u>No Reliance</u>.  Distributor has not received or relied upon any promise or guaranty, express or implied, about the revenues, profits or success of the business venture contemplated by this Agreement.

C.      <u>No Misrepresentation</u>.  All financial and other information provided to Company in connection with Distributor's application to be appointed an authorized distributor is true and correct and no material information or fact has been omitted which is necessary in order to make the information disclosed to Company not misleading.

D.      <u>No Conflict</u>.  No other written or oral agreement, obligation or commitment entered into or made by Distributor before the Effective Date conflicts with Distributor's obligations to Company or restricts Distributor's performance of this Agreement.

E.      <u>Independent Investigation</u>.  Distributor has read this Agreement and understands its terms and has had an opportunity to confer with Distributor's business advisors and legal counsel of its own choice concerning its provisions. Among other things, Distributor represents that it: (i) understands that this Agreement contains a release and understands the significance of the release; (ii) is entering into this Agreement voluntarily of Distributor's own free will and intends to be legally bound by it; (iii) understands that the transaction memorialized by this Agreement involves business risks and is dependent on Distributor's own business acumen and ability; (iv) does not rely on any promises or commitments that are not contained in this Agreement; and (v) fully understands the binding effect of the provisions of this Agreement.

F.      <u>No Payment</u>.

1.      Distributor has not paid, and is not obligated to pay, any money to, or for the account of, Company as a condition to being appointed, or remaining, as an authorized distributor.

2.      If Distributor has acquired all or any part of the assets or ownership interests of any Person which formerly distributed Product, no portion of the consideration which Distributor paid for the interest was paid to, or for the account of, Company.

{00011497 V1}

-24-

3.       In fulfilling its duties under this Agreement, Distributor shall purchase Product from Company for resale. Nothing in this Agreement: (i) requires Distributor to pay an amount in excess of the bona fide wholesale prices of Product; or (ii) requires Distributor to purchase quantities of Product that exceed the amount that a reasonably prudent distributor would purchase in order to meet reasonably anticipated demand by existing and prospective customers in order to ensure the prompt and efficient delivery of Product and avoid out-of-stock conditions.

4.       Except for purchases of Product, all commitments and expenditures that Distributor makes or incurs during the Term in distributing, marketing, or selling Product and fulfilling its duties under this Agreement, including, without limitation, expenses for Distributor's Warehouse, employees and independent contractors, are and will be paid by Distributor: (i) with the express understanding and knowledge that they are part of Distributor's on-going costs of doing business as an authorized distributor, and (ii) to third parties and not to, or for the account of, Company.

XIII.    RELATIONSHIP OF PARTIES; INDEMNIFICATION.

A.    Independent Contractor.

1.       This Agreement does not create a fiduciary relationship or joint venture between the parties, make Distributor a franchisee of Company, or make either party a general or special agent, partner or employee of the other for any purpose. With respect to all matters, Distributor's relationship to Company is as an independent contractor.

2.       Distributor understands and agrees that it is the independent owner of its distribution business and in sole control of all aspects of its operation, and shall conduct its business using its own judgment and discretion, subject only to the provisions of this Agreement.

3.       Distributor shall conspicuously identify itself in all advertising and all dealings with existing or prospective Accounts, consumers of Product, and other third parties as the independent owner of its business operating under a distribution agreement from Company. Distributor is not and shall not be deemed to be Company's agent for any purpose and has no authority in Company's name or on its behalf to transact any business, incur any obligations, undertake any activities, or otherwise bind Company in any manner.

B.    Indemnification by Distributor.

1.       Distributor shall indemnify and hold Company, Company's Affiliate and their respective officers, members of the board of directors, shareholders, trustees, members, managers, employees, agents, successors and assigns, harmless from and against any and all costs, expenses, losses, liabilities, damages, causes of action, claims and demands whatsoever that they, or any of them, may sustain or incur as a result of any act or omission of Distributor, its officers, members of the board of directors, shareholders, trustees, members, managers, employees or agents, or any activity at or in any Distributor Warehouse, including, without limitation: (i) Distributor's performance or breach of this Agreement, (ii) negligence or other tortious conduct; (iii) representations or statements about Product not specifically authorized by Company in writing; (iv) claims brought by or against Distributor's personnel, employees, independent contractors or others who do business with Distributor; or (v) violations of Applicable Law.

2.       Distributor's obligation to indemnify Company shall: (i) apply to claims brought during the Term and after the termination or Distributor's transfer of this Agreement; (ii) apply to claims for actual, consequential or punitive damages of any kind; (iii) cover Company's costs and expenses incurred in defending any third party claim covered by Distributor's indemnification, including, without limitation, attorneys and other professional fees, court costs, and travel and living expenses; and (iv) not apply to Intellectual Property Claims which are within the scope of Company's limited indemnity set forth in **Schedule E**. Company shall have the right to retain its own counsel to defend any third party claim asserted against Company which is covered by Distributor's indemnification agreement.

{00011497 V1}

C.    <u>Indemnification by Company</u>.   Company shall indemnify and hold Distributor, Distributor's Affiliate and their respective officers, members of the board of directors, shareholders, trustees, members, managers, employees, agents, successors and assigns, harmless from and against any and all costs, expenses, losses, liabilities, damages, causes of action, claims and demands whatsoever that they, or any of them, may sustain or incur as a result of: (i) claims arising under the FDA continuing guarantee set forth on **Schedule E**; (ii) Intellectual Property Claims within the scope of **Schedule D**; or (iii) a Recall/Withdrawal Event as provided in this Agreement.

XIV.    <u>GENERAL PROVISIONS</u>.

A.    <u>Notices</u>.   All communications and reports required or permitted to be given to either party hereunder shall be in writing and shall be deemed duly given on the earlier of: (i) the date when delivered by hand; (ii) the next business day after delivery to a reputable national overnight delivery service; or (iii) 4 days after being placed in the United States Mail and sent by certified or registered mail, postage prepaid, return receipt requested. All notices shall be addressed to the parties in accordance with **Schedule H**, except that any party may change its address for receiving notices by appropriate written notice to the other.

B.    <u>Time of the Essence</u>.   Time is of the essence of this Agreement with respect to each and every provision of this Agreement in which time is a factor.

C.    <u>Rights and Remedies</u>.   All rights and remedies provided by this Agreement are in addition to, and not in lieu of, all other rights and remedies available to a party under Applicable Law.   Without limiting the foregoing, Distributor understands and agrees that Company shall be entitled to all remedies as may be awarded by a court of competent jurisdiction including, without limitation, the right to specific performance, damages, injunctive relief and other extraordinary remedies.

D.    <u>Withholding of Consent</u>.   Unless this Agreement specifies otherwise, where this Agreement requires Company's approval or consent, Company has the absolute right to refuse any request by Distributor or to withhold its approval of any action by Distributor.

E.    <u>Waiver</u>.   Any waiver which Company may grant to Distributor that excuses, modifies or reduces any obligation or restriction imposed under this Agreement shall be in writing and shall be effective upon delivery of the writing by Company to Distributor or upon such other effective date as specified in the writing, and only to the extent specifically allowed in such writing.   No waiver granted by Company, and no action taken by Company, with respect to any third party shall limit Company's discretion to take action of any kind, or not to take action, with respect to Distributor.   Any waiver granted by Company to Distributor shall be without prejudice to any other rights that Company may have.   No delay on the part of Company in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by Company of any right or remedy shall preclude Company from fully exercising the right or remedy or any other right or remedy.   Company's acceptance of any payments made by Distributor after a breach of this Agreement shall not be, nor be construed as, a waiver by Company of any breach by Distributor of any term, covenant or condition of this Agreement.

F.    <u>Paragraph Headings; Language</u>.   The paragraph headings used in this Agreement are inserted for convenience only and shall not be deemed to affect the meaning or construction of any of the terms, provisions, covenants or conditions of this Agreement.   The language used in this Agreement shall in all cases be construed simply according to its fair meaning and not strictly for or against Company or Distributor.   The term "<u>Distributor</u>" as used herein is applicable to one or more Persons, corporations, partnerships or entities, as the case may be, and the singular usage includes the plural and the masculine and neuter usage include the other and the feminine.   If two or more Persons are at any time Distributor hereunder, whether or not as partners or joint venturers, their obligations and liabilities to Company shall be joint and several.   Nothing in this Agreement is intended, nor shall it be deemed, to confer any rights or remedies upon any Person or business entity not a party hereto.

G.    <u>Binding on Successors</u>.   The covenants, agreements, terms and conditions contained in this Agreement shall be binding upon, and shall inure to the benefit of, the permitted successors, assigns, heirs and personal representatives of the parties hereto.

{00011497 V1}

-26-

H.     Validity; Conformity With Applicable Law. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be valid under Applicable Law, but if any provision of this Agreement shall be invalid or prohibited under Applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.     If any provision of this Agreement is deemed unenforceable by virtue of its scope in terms of geographic area, business activity prohibited or length of time, but could be enforceable by reducing any or all thereof, the parties agree that the provision shall be enforced to the fullest extent permissible under Applicable Law.

I.     Amendments. Neither this Agreement nor any amendment, change, modification or variance to or from the terms and conditions set forth in this Agreement shall be binding on any party unless it is set forth in writing and executed: (i) on behalf of Distributor, by Distributor if Distributor is an individual, and, if not, by an authorized agent or officer of Distributor; and (ii) on behalf of Company, by two duly authorized officers of Company.

J.     Complete Agreement. The parties agree that:

1.     They each desire to have all terms of their business relationship defined in this written Agreement. Neither Company nor Distributor wishes to enter into a business relationship with the other in which any terms or obligations are the subject of alleged oral statements or in which oral statements serve as the basis for creating rights or obligations different than or supplementary to the rights and obligations set forth herein. Accordingly, Company and Distributor agree that this Agreement supersedes and cancels any prior or contemporaneous discussions that the parties may have had, whether the prior discussions are described as presentations, inducements, promises, understandings or any other term.  The foregoing applies to discussions between Company or anyone acting on its behalf and Distributor or anyone acting on its behalf, which might be taken to constitute agreements, representations, inducements, promises or understandings (or any equivalent to such terms) with respect to the relationship between the parties.  Company and Distributor each agree that they have placed, and will place, no reliance on any such prior or contemporaneous discussions and will look exclusively to this Agreement for the terms of their relationship.

2.     Furthermore, Company and Distributor agree that this Agreement, together with the addenda and schedules attached hereto which the parties hereby incorporate by reference, and any other document which the parties reference in this Agreement and execute simultaneously with executing this Agreement, constitutes the entire agreement between the parties concerning their relationship and contains all of the terms, conditions, rights and obligations with respect to their relationship.  Not only does this Agreement operate to terminate the Existing Agreement and all other prior agreements between the parties, but no prior or contemporaneous written contract, agreement or other writing in any format concerning the subject matter of this Agreement or the parties relationship shall have any force or effect except as the parties expressly provide in Section II addressing the mutual release.  No change, modification, amendment or waiver of any provision of this Agreement shall be effective or binding upon either party unless it is in writing, specifically identified as an amendment hereto and signed by the party to be charged.

K.     Covenant and Condition. Each provision of this Agreement performable by Distributor shall be construed to be both a covenant and a condition.

L.     Survival.  All provisions of this Agreement which expressly, or by their nature, require performance, or apply to a period, after the termination or transfer of this Agreement shall indefinitely survive, and be enforceable, following termination or transfer of this Agreement.

M.     Further Assurances. Each party agrees to execute any additional documents or instruments that are reasonable or necessary to effectuate the purposes of this Agreement.

N.     Incorporation.  The parties hereby incorporate the recitals and schedules attached to this Agreement and make them part of the substantive provisions by this Agreement.

{00011497 V1}

-27-

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed by their duly authorized representatives as of the Effective Date.

COMPANY

Red Bull North America, Inc.,
a California corporation

By: _____
    (signature)

Name:   Sélim Chidiac

Title:   Chief Executive Officer

Date:   7/11/08

By: _____
    (signature)

Name:   Andrea Ceraico

Title:   Chief Financial Officer

Date:   7/11/08

DISTRIBUTOR

KC Distributing, LLC

By: _____
    (signature)

Name:   Kelly Clymer

Title:   President/owner

Date:   7/03/08

Federal Tax Id.:   20-8025684

**SCHEDULE A**

**VAN SALES TEAMS ADDENDUM**

Company and Distributor hereby agree that Distributor shall not be required to have Van Sales Teams only in the following Counties of the Territory:

_____

_____

_____

_____

_____

_____

COMPANY

Red Bull North America, Inc.,
a California corporation

By: _____
    (signature)

Name:   Sélim Chidiac

Title:  Chief Executive Officer

Date: _____

DISTRIBUTOR

KC Distributing, LLC

By: _____
    (signature)

Name:   _____

Title:  _____

Date:   _____

Federal Tax Id.: _____

## SCHEDULE B

### TERRITORY

Distributor's Territory is the following area:

In the State of Texas, the following Counties:

Archer, Baylor, Clay, Collin, Cooke, Delta, Denton, Fannin, Foard, Franklin, Grayson, Hardeman, Hopkins, Knox, Lamar, Montague, Red River, Wichita and Wilbarger.

SCHEDULE C

RED BULL DISPLAY EQUIPMENT

TERMS OF USE AGREEMENT

**Effective Date of Equipment Agreement:** _____

**"Display Equipment:"**

| RED BULL DISPLAY EQUIPMENT DESCRIPTION & MODEL NAME | | UNIT # | |
|---|---|---|---|
| | | | |

**"Distributor:"**

| DISTRIBUTOR NAME | | | |
|---|---|---|---|
| ADDRESS | | | |
| CITY | | STATE | |
| PHONE | | ZIP | |
| CONTACT NAME | | | |

**"Account:"**

| NAME OF OWNER OF ACCOUNT | | | |
|---|---|---|---|
| ACCOUNT TRADE NAME | | | |
| ADDRESS OF ACCOUNT BUSINESS PREMISES | | STATE | |
| CITY | | ZIP | |
| CONTACT NAME | | | |
| PHONE | | ACCOUNT MANAGER | |
| DATE PLACED | | ROUTE # | |

For valuable consideration, Distributor and Account agree:

1.      Distributor is an authorized distributor of RED BULL energy drink and/or Red Bull Cola ("Product"). Red Bull North America, Inc. ("Company") and Distributor are parties to a written agreement granting Distributor the right to sell Product to Accounts within a geographic area that includes Account's business premise (the "Premise") and to furnish Accounts with certain types of display equipment for the storage and display of

Product. Nothing in this Equipment Agreement creates a contract between Company and Account, imposes obligations on Company, or makes Account a third party beneficiary of Distributor's contracts with Company.

2. Account shall sell Product only to customers for ultimate consumption and not to customers which Account knows, or has reason to believe, purchase Product for the purpose of resale. Account shall sell Product only at the Premise and shall not, directly or indirectly, sell Product through vending or dispensing machines of any kind.

3. Account shall at all times conduct business in accordance with Applicable Law.

4. Account shall store and handle Product, and use the Display Equipment, strictly in accordance with the instructions that Distributor may issue from time to time. Account shall not remove or relocate the Display Equipment from the Premise, nor shall Account sell or otherwise dispose of the Display Equipment.

5. Account shall not remove, deface or alter the RED BULL Proprietary Marks that may appear on the Display Equipment or add or display on the Display Equipment any other trademarks, service marks, trade names, words, designs, graphics, 3-dimensional objects, symbols, logos, or other identification marks or commercial symbols of any kind.

6. Account shall use due care in handling the Display Equipment and not situate the Display Equipment in a place in the Premise where Account knows, or should know, the Display Equipment may become damaged. The duty to use due care shall include, without limitation, the duty to supply adequate electrical power for proper operation of the Display Equipment.

7. Account shall use the Display Equipment only to store and display Product for sale, and not use it to store or display any other item or for any other purpose.

8. Distributor and Company may each enter the Premise at any time during Account's normal business hours without prior notice to inspect Account's operations in order to verify that Account is using the Display Equipment and selling Product in accordance with this Equipment Agreement.

9. Distributor and Company may also each enter the Premise at any time during Account's normal business hours for purposes of removing the Display Equipment under the following conditions: (i) without prior notice if the Display Equipment is damaged, in disrepair or malfunctions; or (ii) in all other cases, upon 48 hours prior notice. Distributor shall bear all expenses to remove the Display Equipment from the Premise.

10. Account shall immediately notify Distributor if the Display Equipment becomes damaged, in disrepair or malfunctions. Account shall immediately discontinue using the Display Equipment if the nature of the problem could compromise the integrity of Product or otherwise threaten public health or safety. Account understands and agrees that Distributor shall solely determine the course of action to be taken with respect to Display Equipment that becomes damaged, in disrepair or malfunctions.

11. Nothing in this Equipment Agreement gives, or implies, that: (i) Distributor is obligated to sell Product to Account; (ii) Account is obligated to buy Product from Distributor; (iii) Distributor is obligated to replace the Display Equipment in the event of damage, disrepair or malfunctioning; (iv) Distributor is obligated to replace the Display Equipment if newer models become available; or (v) Account has the right to use the Display Equipment, or any other model of display equipment, for as long as Account purchases Product from Distributor.

**[CONTINUED ON NEXT PAGE]**

12. Account shall maintain in force policies of insurance that are customarily carried by like establishments. If applicable to Account, this includes, without limitation, policies covering establishments that serve liquor or other alcoholic beverages to the public. All insurance shall provide coverage sufficient to insure Account against risks of loss or damage arising or resulting from malfunction or mishandling of the Display Equipment, fire and other property damage, commercial general liability, worker's compensation and any other types of insurance if required by applicable law.

| DATE | | DATE | |
|------|--|------|--|
| | | | |
| **DISTRIBUTOR (AUTHORIZED SIGNATURE)** | | **ACCOUNT (AUTHORIZED SIGNATURE)** | |

**SCHEDULE D**

**TERMS OF USE OF PROPRIETARY MARKS AND CONFIDENTIAL INFORMATION**

A. <u>Proprietary Marks Terms of Use</u>. Subject to the terms and conditions of this Agreement, Company grants to Distributor a limited, non-exclusive right to use the specific Proprietary Marks that Company designates in writing from time to time in connection with the marketing, distribution and sale of Product during the Term.

1. Distributor shall acquire no right, title or interest in the Proprietary Marks other than a limited, non-exclusive right to use the Proprietary Marks on the terms of this Agreement. Distributor understands and agrees that Company and Company's Affiliate hold and retain full ownership of the Proprietary Marks and all goodwill therein, and that all use by Distributor is for, and inures to the benefit of, Company and Company's Affiliate.

2. Distributor shall not, directly or indirectly, contest, or assist any other Person to contest, the validity of Company's, or Company's Affiliate's, rights and interest in the Proprietary Marks either during the Term or after this Agreement terminates.

3. Distributor shall: (i) use only the Proprietary Marks designated by Company and only in the manner authorized and permitted by Company; (ii) use the Proprietary Marks only in distributing, marketing and selling Product pursuant to this Agreement and in connection with no other activities; (iii) display notices of trademark and service mark registrations in the exact manner that Company specifies; and (iv) prominently post notices to inform clients and the general public that Distributor is an independent owner of its business.

4. Distributor shall not use the Proprietary Marks or any part thereof: (i) in its corporate or legal name, assumed name, trade name, "d/b/a" or other name or identity under which Distributor does business; (ii) with any prefix, suffix or other modifying words, terms, designs, colors or symbols; (iii) in any modified form; (iv) in connection with the sale of any unauthorized Product or services; (v) in any manner not expressly authorized in writing by Company; or (v) in any manner that may result in Company's liability for Distributor's debts or obligations.

5. Distributor shall not adopt, use or register any words, phrases or symbols which, in Company's sole judgment, are confusingly similar to any of the Proprietary Marks.

6. Company reserves the right to: (i) modify or discontinue licensing any of the Proprietary Marks; and (ii) add new names, marks, designs, logos or commercial symbols to the Proprietary Marks and require that Distributor use them. Distributor shall comply, at Distributor's sole expense, with Company's directions regarding changes in the Proprietary Marks within the time period indicated in Company's written notice directing that the change be made. Company shall have no liability to Distributor for any cost, expense, loss or damage that Distributor incurs in complying with Company's directions and conforming to required changes.

7. Distributor understands and agrees that any unauthorized use of the Proprietary Marks by Distributor shall constitute both a breach of this Agreement and an infringement of Company's, and Company's Affiliate's, intellectual property rights.

B. <u>Confidential Information Terms of Use</u>. Distributor understands and agrees that Company has no obligation to disclose Confidential Information to Distributor. However, to the extent that Company discloses, or Distributor acquires knowledge of, Confidential Information, Distributor agrees:

1. Distributor shall acquire no right, title or interest in the Confidential Information other than a limited, non-exclusive right to use the Confidential Information to discharge its obligations under this Agreement. Distributor understands and agrees that Company, and Company's Affiliate, hold and retains full ownership of the Confidential Information and all goodwill therein.

2. Distributor's use, publication or duplication of Confidential Information for any purpose not authorized by this Agreement constitutes an unfair method of competition by Distributor and, additionally, grounds for termination of this Agreement.

3.      Upon request by Company, Distributor shall deliver to Company a separate Confidentiality, Non-Disclosure and Non-Competition Agreement in the form required by Company, executed by Distributor and by each Person who is now, or during the Term becomes, a Covered Person.

4.      Distributor agrees: (i) not to disclose Confidential Information to any Person, except to those of its employees who require knowledge of the Confidential Information to enable Distributor to discharge its obligations under this Agreement; and (ii) to observe and implement the procedures prescribed from time to time by Company to prevent the unauthorized or inadvertent use, publication or disclosure of Confidential Information including, without limitation, requiring that employees with access to Confidential Information, who are not otherwise required to sign a Confidentiality, Non-Disclosure and Non-Competition Agreement, execute Company's current form of Confidentiality, Non-Disclosure and Non-Competition Agreement with Distributor. Upon request from Company, Distributor shall deliver to Company a copy of each executed Confidentiality, Non-Disclosure and Non-Competition Agreement for its records. Distributor shall notify its employees to whom Distributor discloses Confidential Information of the confidential nature of Confidential Information and the requirements of this Agreement.

5.      Company may terminate this Agreement if Distributor, or any Person required by this Agreement to execute a Confidentiality, Non-Disclosure and Non-Competition Agreement with Company or Distributor, breaches the Confidentiality, Non-Disclosure and Non-Competition Agreement.

6.      The provisions concerning non-disclosure of Confidential Information shall not apply if disclosure of Confidential Information is legally compelled in a judicial or administrative proceeding, provided Distributor shall have used its best efforts, and shall have afforded Company the opportunity, to obtain an appropriate protective order or other assurance satisfactory to Company of confidential treatment for the information required to be disclosed.

C.      Enforcement.   In order to enforce the provisions of this Schedule, Company may exercise any and all remedies available to it under Applicable Law, including, without limitation, the right to specific performance, damages and injunctive relief and other extraordinary remedies. Without limiting the foregoing, Distributor understands and agrees that Company shall be entitled to all remedies as may be awarded by a court of competent jurisdiction in the exercise of its powers.

D.      Intellectual Property Claims.

1.      As between the parties, Company shall have the sole right to handle all Intellectual Property Claims, including, without limitation, the right to recover any damages therefore, and Distributor shall cooperate fully with Company to protect Company's and Company's Affiliate's rights.

2.      Distributor shall immediately notify Company in writing if Distributor receives notice, or is informed, of any Intellectual Property Claim filed or threatened against Distributor or conduct or information which Distributor knows or suspects may involve an Intellectual Property Claim.

3.      Company shall have sole discretion to investigate all Intellectual Property Claims and to take such action as it deems appropriate, including, without limitation, to take no action, and the sole right to control any legal proceeding or negotiation arising out of any Intellectual Property Claims.

4.      Distributor shall have no right to settle or compromise any Intellectual Property Claims or demands involving Intellectual Property Claims asserted against Distributor and agrees to be bound by Company's decisions in handling Intellectual Property Claims. Distributor shall cooperate fully with Company and execute such documents and perform such actions as may, in Company's sole judgment, be necessary, appropriate or advisable in order to protect and maintain Company's and Company's Affiliate's rights in the Proprietary Marks, Product and Confidential Information.

5.      Unless it is established that an Intellectual Property Claim asserted or threatened against Distributor is based, directly or indirectly, upon Distributor's misuse of the Proprietary Marks or Confidential Information, or other breach of this Agreement, Company agrees to defend Distributor against the Intellectual Property Claim, provided Distributor has notified Company immediately after first learning of the Intellectual Property Claim

and fully cooperates in the defense of the Intellectual Property Claim. Because Company will defend the Intellectual Property Claim, Distributor is not entitled to be reimbursed for legal or other professional fees or costs paid to independent legal counsel or others which Distributor elects to retain on its behalf in connection with the Intellectual Property Claim.

6.     With respect to any Intellectual Property Claim for which Company defends Distributor, Company agrees: (i) to indemnify and hold Distributor harmless from any damage or award which Distributor is held liable to pay to a third party arising from Distributor's conduct in accordance with this Agreement, and (ii) to reimburse Distributor for costs or expenses to adopt new Proprietary Marks in accordance with a court order or settlement of the Intellectual Property Claim; provided, however, nothing in this Agreement obligates Company to indemnify Distributor for its lost profits or consequential damages of any kind arising from the Intellectual Property Claim or the duty to adopt new Proprietary Marks.

E.     Survival.  The parties agree that the provisions of this Schedule shall survive the termination or Distributor's transfer of this Agreement.

**SCHEDULE E**

**FDA CONTINUING GUARANTEE**

Company guarantees that each shipment or delivery of Product that Company makes during the Term to, or on behalf of, Distributor shall not, on the date that Company delivers the shipment or delivery to the designated common carrier, contain any article that is: (i) adulterated or misbranded within the meaning of the Federal Food, Drug, and Cosmetic Act, or (ii) prohibited from being introduced into interstate commerce under Sections 404, 505 or 512 of the Federal Food, Drug, and Cosmetic Act. **EXCEPT FOR THE FOREGOING STATEMENT, COMPANY DISCLAIMS ALL OTHER, AND MAKES NO, EXPRESS OR IMPLIED WARRANTIES CONCERNING PRODUCT, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.**

**SCHEDULE F**

**DISPUTE RESOLUTION**

A.       Agreement to Mediate Disputes.  Except as provided in subsection B below, no party shall bring any claim or action arising out of the parties' relationship, or this Agreement, or seeking enforcement of, or any other legal remedy founded on, this Agreement, until the dispute has been submitted to mediation conducted in accordance with the procedures stated in this Agreement.

1.       Either party may initiate a mediation proceeding by sending a written Request for Mediation to the office of the American Arbitration Association located closest to Company's Headquarters (the "Mediation Service"), with a copy to the other party.  The Request for Mediation shall describe with specificity the nature of the dispute and claim for relief.  Thereupon, both parties will be obligated to engage in the mediation, which shall be conducted in accordance with the Mediation Service's then current rules, except to the extent such rules conflict with this Agreement, in which case this Agreement shall control.

2.       A single mediator, who must be a retired judge with no past or present affiliation or conflict with any party to the mediation, will conduct the mediation.  The parties agree that mediator and Mediation Service's employees shall be disqualified as a witness, expert, consultant or attorney in any pending or subsequent proceeding relating to the dispute which is the subject of the mediation.

3.       Upon receipt of the Request for Mediation, Mediation Service shall provide the parties with a list of mediators willing to serve.  The parties shall attempt in good faith to agree upon a mediator.  If the parties are unable to agree upon a mediator, and either party so advises Mediation Service of that fact in writing within 10 days after receipt of the list, Mediation Service shall appoint the mediator; provided, however, if neither party notifies Mediation Service within that time, the parties hereby authorize Mediation Service to appoint the mediator.  The fees and expenses of Mediation Service, including (without limitation) the mediator's fee, shall be shared equally by the parties.  Each party shall bear its own attorney's fees and other costs incurred in connection with the mediation irrespective of the outcome of the mediation or the mediator's evaluation of each party's case.

4.       The mediation proceeding shall commence within 30 days after selection of the mediator.  The mediation shall be conducted at the office of the Mediation Service located closest to Company's Headquarters, unless Company, Distributor and the mediator agree upon a mutually acceptable alternative location.

5.       At least 7 days before the first scheduled session of mediation, each party shall deliver to the mediator and to the other party a concise written summary of its position with respect to the matters in dispute and claim for relief, and such other matters required by the mediator.

6.       Distributor and Company shall each cause one representative having full authority to settle the claim on its behalf to attend the mediation session.  The parties shall participate in good faith in the mediation with the intention of resolving the dispute, if at all possible.  The parties recognize and agree, however, that the mediator's recommendations and decision shall not be binding on the parties.

7.       During the mediation, the mediator may have joint and separate meetings with the parties and their counsel, at the mediator's discretion.  The mediation proceeding shall continue until conclusion, which is deemed to occur when: (i) a written settlement is reached, (ii) the mediator concludes and informs the parties in writing that further efforts would not be useful, or (iii) the parties agree in writing that an impasse has been reached.  Neither party may withdraw before the conclusion of the mediation proceeding.

8.       The mediation proceeding shall be private and non-binding, and shall be treated as a compromise settlement negotiation.  All offers, promises, conduct and statements, whether oral or written, made in the course of the mediation proceeding by any party or their agents, experts, counsel, employees or representatives, and by the mediator and Mediation Service's employees, are confidential.  Such offers, promises, conduct and statements may not be disclosed to any third party and are privileged and inadmissible for any purpose, including impeachment, under Applicable Law and rules of evidence; provided, however, that evidence otherwise discoverable or admissible shall

not be rendered not discoverable or inadmissible as a result of its use in the mediation. If a party informs the mediator that information is conveyed in confidence by the party to the mediator, the mediator will not disclose the information.

9.      In order to preserve the confidentiality of the mediation proceeding, the mediator shall not provide a written evaluation of either party's claims and defenses or of the likely resolution of the dispute if not settled.

B.      Exception to Duty to Conduct Mediation.

1.      Notwithstanding subsection A. of this Section, or any other provision of this Agreement (including, without limitation, any other provision of this Agreement relating to mediation), either party may bring suit in any court of competent jurisdiction to enjoin any actual or threatened violation of this Agreement pertaining to: (i) the use of the Proprietary Marks or Confidential Information; (ii) competition with Company during the Term; or (iii) other act which is, or may be, detrimental or harmful to the reputation and goodwill of Company or Product.

2.      Distributor understands and agrees that Company will suffer irreparable injury not capable of precise measurement in money damages if Distributor, or any Person on Distributor's behalf, commits any actual or threatened violation of this Agreement pertaining to: (i) the use of the Proprietary Marks or Confidential Information; (ii) competition with Company during the Term; or (iii) other act which is, or may be, detrimental or harmful to the reputation and goodwill of Company or Product. Accordingly, in the event of any actual or threatened violation of the foregoing matters, Distributor, on behalf of itself and each Covered Person, hereby consents to entry of a temporary restraining order or other injunctive relief as well as to any other equitable relief which may be granted by the court, without the requirement that Company post bond. Distributor further agrees that the award of equitable remedies to Company in the event of such actual or threatened violation of this Agreement is reasonable and necessary for the protection of the business and goodwill of Company.

C.      Judicial Relief

1.      The parties agree that: (i) all disputes arising out of or relating to this Agreement which are not resolved by mediation, and (ii) all claims described in sub-paragraph B. above, shall be brought in either the state or federal courts located closest to Company's Headquarters. Distributor understands and agrees that, as of the Effective Date, Company's Headquarters are in Santa Monica, California, and that Company has the absolute right to relocate Company's Headquarters at any time, without notice to Distributor. In the event Company relocates Company's Headquarters, the mandatory venue for all judicial actions initiated after the date of relocation shall be determined based on the new address of Company's Headquarters; provided, however, relocation shall not affect the venue of pending action. Distributor hereby consents to personal jurisdiction before all such courts and agrees to accept service of process in any litigation initiated in such courts regardless of the state of Distributor's residence or the Territory.

2.      If a party commences litigation in another venue in breach of this Agreement, the other party may seek to have the litigation transferred to a state or federal court located closest to Company's Headquarters, and each party hereby waives all rights under Applicable Law to oppose such a transfer, including, without limitation, based on the alleged inconvenience of any party or witness. The parties expressly agree to waive trial by jury in any such legal proceeding.

3.      If either party attempts to initiate litigation in a venue other than in a state or federal court sitting in Los Angeles County, California, the other party shall be entitled to reimbursement of all fees, costs and expenses which it incurs, including fees to retain attorneys, accountants or other experts, to enforce its right to have: (a) the dispute or claim resolved by mediation first, and (b) the litigation transferred to the state or federal court located closest to Company's Headquarters.

D.      Choice of Law. The parties agree that California law shall govern the construction, interpretation, validity and enforcement of this Agreement and shall be applied in any mediation or judicial proceeding to resolve all disputes between them, except that: (i) California conflict of law principles shall not be applied if the application of such principles would result in the law of a state other than California governing the resolution of a dispute under this Agreement, and (ii) to the extent that the subject matter of the dispute arises exclusively under federal law, federal law shall govern.

E.      Limitation of Actions.  Company and Distributor agree that no form of legal proceeding permitted under this Agreement may be maintained by either party to enforce any liability or obligation of the other party, whether arising from this Agreement or otherwise, unless the legal proceeding is initiated before the expiration of the earlier of: (a) one year after the date of discovery of the facts resulting in the alleged liability or obligation or (b) two years after the date of the first act or omission giving rise to such alleged liability or obligation.

F.      Punitive Damages.  Company and Distributor, and their respective members of the board of directors, officers, shareholders and guarantors, as applicable, each hereby waive to the fullest extent permitted by law, any right to, or claim for, punitive or exemplary damages against the other and agree that, in the event of a dispute between them, each is limited to recovering only the actual damages proven to have been sustained by it.

G.      Survival.  The parties agree that the dispute resolution provisions of this Agreement shall survive the termination or Distributor's transfer of this Agreement.

## SCHEDULE G

## EXECUTIVE MANAGEMENT AND OWNERS
### (As of the Effective Date)

In the space provided, in Part I, list the name and position held of each individual who is a member of Distributor's Executive Management; in Part II, complete the chart for Distributor and each Distributor Affiliate; and in Part III, list the name and ownership interest of each individual who owns an interest in Distributor and each Distributor Affiliate that is a corporation, partnership, limited liability company or other type of business entity.

## PART I
## DISTRIBUTOR'S EXECUTIVE MANAGEMENT

Distributor's Executive Management includes any individual who falls within the following categories: (i) is a principal officer or member of the board of directors of Distributor if Distributor is a corporation; (ii) is a general partner of Distributor if Distributor is a general or limited partnership; (iii) is a manager of Distributor if Distributor is a limited liability company; (iv) occupies a similar status or performs similar functions, whether as an employee or independent contractor, as an individual described in (i), (ii) or (iii); or (v) is a General Manager.  Print the names of the individuals in the appropriate space below.  Attach additional pages if needed.

(i)     Principal Officers (complete only if Distributor is a corporation):

_Kelly Clymer  -  President_

_Mike Berry  -  V- President_

_____

(ii)    Members of the Board of Directors (complete only if Distributor is a corporation):

_____

_____

_____

(iii)   General Partners (complete only if Distributor is a general or limited partnership):

_____

_____

_____

(iv)    Managers (complete only if Distributor is a limited liability company)

_____

_____

_____

(v)     Individuals who occupy a similar status or perform similar functions, whether as an employee or independent contractor, as an individual identified in (i), (ii), (iii) or (iv) (complete in all cases):

_____

_____

_____

(vi)    General Managers (complete in all cases):

_____Scott Colton – General Sale Manager_____

_____

_____

**PART II**
**DISTRIBUTOR AND DISTRIBUTOR AFFILIATES**
**IDENTIFICATION, ADDRESS AND AUTHORIZED SECURITIES**
**(Complete for Distributor and each Distributor Affiliate)**

| Name (use separate row for Distributor and each Distributor Affiliate) | State of Organization or Incorporation (complete only for business entities) | Mailing Address (complete in all cases) | Authorized Securities (identify each class and total number of authorized securities per class) (complete only for corporations) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

## PART III
## OWNERS

If Distributor of any Distributor Affiliate identified in Part II is a corporation, partnership, limited liability company or other type of business entity, print the name and address of every Person who is a legal or beneficial owner of any of the outstanding ownership interests as of the Effective Date.  Attach additional pages if needed.

| Name | Mailing Address | Indicate Distributor or name of Distributor Affiliate in which Person owns an ownership interest | Describe ownership interest.  For corporations, specify number and class of securities; for all other entities, specify ownership interest and percentage owned of  total outstanding ownership interests. |
|---|---|---|---|
| William Kelly Clymer | 10615 Fishtrap Rd Aubey, TX 76227 | KC Distributing LLC | William Kelly Clymer 100% |
|  |  |  |  |
|  |  |  |  |

## SCHEDULE H

## ADDRESSES FOR NOTICES

**Company's address for notices:**

**RED BULL NORTH AMERICA, INC.**

Mailing Address:       Legal Department
1740 Stewart Street
Santa Monica, CA 90404
Fax: 310-309-5295

**Distributor's address for notices:**

Mailing Address:       KC Distributing, LLC
Kelly Clymer
10615 Fishtrap Road
Aubrey, TX 76227
Tel:  940-440-0616
Fax: 940-440-0621

## SCHEDULE I

## PRODUCT

Except as the parties otherwise agree by amending this **Schedule I**, Product means only:

**Red Bull Energy Drink**
**Red Bull Sugar Free**
**Red Bull Cola**

**EXHIBIT 2**



Red Bull North America, Inc.

February 13, 2020

KC Distributing, LLC
Kelly Clymer
10615 Fishtrap Road
Aubrey, TX 76227

Ladies and Gentlemen:

Reference is hereby made to that certain Distribution Agreement (the "Agreement") dated as of July 1, 2008, by and between Red Bull North America, Inc. ("Company") and KC Distributing, LLC ("Distributor"). Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Agreement.

This letter shall serve as notice that:

Pursuant to Section VIII.B of the Agreement, "Termination Without Cause," Company hereby exercises its contractual right to terminate the Agreement without cause. This termination will be effective May 1, 2020 (*i.e.*, Distributor's last day of operation under the Agreement will be April 30, 2020).

Please be advised that Distributor shall remain obligated to comply with the duties set forth in Section IX of the Distribution Agreement.

Company reserves all rights to raise any claims regarding a breach of the Distribution Agreement. This letter shall not be construed as a waiver of any rights which Company has under the Distribution Agreement or applicable law.

Sincerely,

Joe Waters
Executive Vice President/General Manager, SOBU
Red Bull North America, Inc.

{RB00050089 V1}

48

**EXHIBIT 3**

FILED
6/10/2020 7:59 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Christi Underwood DEPUTY

CAUSE NO. DC-20-08072 _____

| | |
|---|---|
| KC DISTRIBUTING, LLC | IN THE DISTRICT COURT |
| Plaintiff | |
| v. | |
| RED BULL NORTH AMERICA, INC., a California Corporation; RED BULL DISTRIBUTING COMPANY, Inc., a California Corporation; TRAVIS HAIGHT, an individual; MATTHEW CARPENTER, an individual; DAVID FISHLOCK, an individual; JOSEPH WATERS, an individual; and, NICK VANDERLINDEN an individual. | M-298 ____ JUDICIAL DISTRICT |
| | |
| | DALLAS COUNTY, TEXAS |
| Defendants. | |

## PLAINTIFF'S ORIGINAL PETITION, REQUESTS FOR DISCLOSURE AND REQUESTS FOR PRODUCTION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES KC Distributing, LLC (**"KC"** and/or **"Plaintiff"**), and file this its Plaintiff's Original Petition complaining of and about Red Bull North America, Inc. ("Red Bull"), Red Bull Distributing Company, Inc. (**"RBDC-North Texas-Northeast Texas"**), Travis Haight ("Haight"), David Fishlock (**"Fishlock"**), Matthew Carpenter (**"Carpenter"**), Nick VanderLinden (**"VanderLinden"**), and Joseph Waters (**"Waters"**), (collectively, **"Defendants"**) and, for cause, would respectfully show the Court as follows:

### I.    DISCOVERY CONTROL PLAN LEVEL

1.      Plaintiff intends that discovery be conducted under Discovery Level 3.

### II.    PARTIES AND SERVICE

---

2.      Plaintiff KC Distributing is a Texas limited liability company doing business in various counties throughout Dallas and North Texas.  Mr. Kelly Clymer (**"Clymer"**) is the President and owner of KC Distributing.

3.      Defendant Red Bull North America, Inc. (**"Red Bull"**) is headquartered in California, but maintains principal offices in Texas.  Red Bull North America, Inc. may be served with process and citation by serving its registered agent, CT Corporation System, 1999 Bryan St., Ste 900, Dallas Texas 75201-3136, or wherever else it may be found.

4.      Defendant Red Bull Distributing Company, Inc. (**"RBDC-North Texas-Northeast Texas"**) is headquartered in California, but maintains principal offices in Texas.  RBDC-North Texas-Northeast Texas may be served with process and citation by serving its registered agent CT Corporation System, 1999 Bryan St., Ste 900, Dallas Texas 75201-3136, or wherever else it may be found.

5.      Defendant Nick VanderLinden ("**VanderLinden"**) is the General Manager of Red Bull.  VanderLinden is a Texas resident, and may be served with process and citation by serving him at RBNA – Red River Office, 2616 Main Street, Suite 200, Dallas, Texas 75226, or wherever else he may be found.

6.      Defendant Joseph Waters (**"Waters"**) is the Vice President/General Manager of Red Bull's South Business Unit. Waters is a Georgia resident who works and manages part of Red Bull's distribution networks in Texas.  Waters may be served with process and citation by serving him at 976 Brady Ave. NW #400, Atlanta, Georgia 30318, or wherever else he may be found.

7.      David Fishlock (**"Fishlock"**) is the director of Distribution at Red Bull. Fishlock is a Florida resident, and may be served with process and citation by serving him at 2099 Bonnie Street, Boca Raton, Florida 33486, or wherever else he may be found.

8.      Defendant Matthew Carpenter (**"Carpenter"**) is the Red River Regional Sales Manager with Red Bull.  Carpenter is a Texas resident who lives and works in Texas, and may be served with process and citation by serving him with process and citation at RBNA – Red River Office, 2616 Main Street, Suite 200, Dallas Texas 75226, or wherever else he may be found.

9.      Defendant Travis Haight (**"Haight"**) is the Distributor Partner Manager at Red Bull. Haight is a Texas resident who manages a Red Bull distribution network in Texas. Haight may be served with process and citation by serving him at RBNA – Red River Office, 2616 Main Street, Suite 200, Dallas Texas 75226, or wherever else he may be found.

### III.      JURISDICTION AND VENUE

10.     This Court has jurisdiction herein because KC's principal place of business is located in Texas and Red Bull has numerous distribution relationships in Texas, maintains a local office in Texas, has a registered agent in Texas, and generally does business in Texas.  In addition, several Defendants reside in Texas, and those who do not reside in Texas conduct business in Texas.

11.     Venue is appropriate in Dallas County, Texas, because the acts or omissions giving rise to Plaintiff's claims arose, in whole or in substantial part, in Dallas County, Texas.  At the time that the events that give rise to this lawsuit occurred, Red Bull's office was in Dallas County, and meetings, conversations and events that give rise to this lawsuit occurred at Red Bull's office in Dallas County, and at local restaurants in Dallas County, Texas.

12.     Clymer, along with KC's General Manager, Darby Carmichael, met with top Red Bull executives David Fishlock, Nick VanderLinden, and Travis Haight on November 20, 2019 in downtown Dallas wherein Red Bull and its executives approved KC's 2020 Business Plan and induced KC to increase and expand its capital investments into Red Bull.  In particular, during this

November 2019 meeting, as well as multiple other meetings that took place in Dallas County, Red Bull executives and the individual Defendants named herein made a number of misrepresentations and omissions complained of herein and took actions in furtherance of their fraudulent schemes complained of herein.  They also sent correspondence to KC from the Dallas Red Bull office in Dallas County, initiated telephone conferences from that office, and held business meetings complained of herein at that office with Clymer and other members of the KC management team.

13.     As another example and as described below, Red Bull and the individual Defendants, as part of their fraudulent scheme to induce KC to build a new large warehouse, spend more money and invest more resources in expanding KC's Red Bull distribution in Texas, made multiple representations to KC and KC's management team, including representations that KC was not at risk in being terminated by Red Bull, and that KC was a life-long "partner" who was a key component to Red Bull's growing success. Red Bull and the individual Defendants verbally approved KC in moving forward with the warehouse and improvements, and induced KC to spend additional expenditures well over $100,000 to move forward. Throughout the years, Red Bull executives promised KC, while at Red Bull's Dallas office, that based on KC was never at risk of losing his distributorship.

14.     The very fraud that Plaintiff complains about in this lawsuit took place in Dallas County, in large part, at the Dallas Red Bull office.

15.     Pursuant to TEX. R. CIV. P. 47, the Plaintiff seeks monetary relief against the Defendants for more than $1,000,000.00.[1]

---

[1]Plaintiff reserves the right to amend, decrease and/or increase the amount of damages plead based on evidence developed before trial.

## IV.   FACTS

16.      Red Bull is an energy drink sold in the United States and abroad. Red Bull's international corporate headquarters is located in Austria, and its North American headquarters is located in Santa Monica, California.

**Third-Generational Family-Owned Distributor**

17.      KC is a third-generation, family-owned food-beverage distributorship, which was formerly known as Golden Distributing Company.  Kelly Clymer and his family have been in the business of distributing alcoholic and non-alcoholic beverages since the 1950s, distributing the products of numerous well-known beverage manufacturers to all channels of trade, including grocery, gas and convenience stores, mass market, super markets and club stores. The Clymers and Golden Distributing were widely known and respected in the industry for its success in effecting broad distribution of beverage products across all channels of trade, particularly the grocery and supermarket accounts where it had well-established business relationships.

18.       In 1997, Red Bull contacted Golden Distributing and proposed that Golden Distributing accept the rights to distribute Red Bull in Wilbarger, Wichita, Baylor, Archer, Clay, Montague, Cooke, Denton, Grayson, Collin, Fannin, Lamar, Red River, Franklin, and Delta Counties in the State of Texas.  In 1997, Golden Distributing was the first Texas distributor to distribute Red Bull products in the state of Texas. Golden Distributing was also a distributor of other beverages, including Coors beer.  Mr. Kelly Clymer operated Golden Distributing from 1982 up through 2007 when Golden Distributing sold its Coors-distributor rights to another independent distributor.

19.      Prior to this transition, and in April of 2006, Clymer met with Pape Swanson, Red Bull's Texas Vice President/General Manager, for dinner in Corpus Christi wherein they discussed

Clymer's negotiations and decision to sell Golden Distributing Company's assets to another independent distributor.

20.     Knowing the value of Clymer's expertise as a distributor, his well-established relationships in the business and the Red Bull success that Clymer achieved for the previous nine (9) years, Swanson, as Red Bull's agent, requested that Clymer stay on as the Red Bull distributor. Clymer advised Swanson that with his and Red Bull's blessing and continued partnership, Clymer would create a new entity and prepare a future business plan moving forward with the Red Bull distributorship in Texas.

21.     In reliance on Red Bull's representations, Clymer created KC, and made his business presentation to Red Bull, which was reviewed, analyzed and overwhelmingly approved by Red Bull.  On January 1, 2007, after the dissolution of Golden Distributing Company, Red Bull and KC entered into a "Distributor Agreement" including many similar terms as the 1997 agreement. In the 2007 Distribution Agreement, and in the subsequently executed July, 1, 2008 Distribution Agreement, Red Bull incorporated Clymer's creation of the "Van Teams," which is defined in the Agreement as follows:

> "Van Teams" refer to Distributor's employees who sell Product by direct store delivery to Retail Accounts in accordance with the Company's merchandising methods and who complete delivery in specially decorated vehicles meeting Company's imaging specifications.

22.     Clymer created "Van Teams" early in his tenure with Red Bull, and successfully implemented this marketing strategy within his territories. Red Bull took notice, and ultimately implemented this marketing strategy among almost all Red Bull distributors.  Van Teams became the "standard" for Red Bull distributorships.  The July 1, 2008 Distribution Agreement also added

three additional Texas Counties – Foard, Hardeman, and Knox Counties – where KC became the exclusive distributor of Red Bull products.[2]

23.     By relying on Mr. Swanson's and Red Bull's representations and their inducements to stay on as a Texas Red Bull distributor and a "partner" with Red Bull, KC invested more than $800,000.00 in its new "partnership" with Red Bull.   These new start-up costs, included the following expenditures: (i) Furniture and fixtures = $10,000; (ii) Seven Vans[3] = $217,903.14; (iii) Box Truck = $35,632.85; (iv) Fork Lift = $6,500; (v) Ramp = $12,000; and, (vi) Six Storage Pods[4] = $21,000.   KC also incurred land and building costs in excess of $500,000, plus employee costs. Red Bull and Mr. Swanson were aware that Clymer and KC would have to incur these start-up costs as a result of Golden Distributing selling its assets and its Coors Beer distributing rights to a third-party. Red Bull and Swanson were also fully aware that Clymer would be required to buyout his father's interest in Golden Distributing, which exceeded $1.1 million.   In 2013, KC also expended $600,000 in developing a unique retail accounting program in order to maximize its Red Bull sales.   KC would not have made these investments and incurred these costs, but for Swanson's and Red Bull's representations.

24.     As a condition to getting the rights to distribute Red Bull products in the Territory, Red Bull demanded that KC follow a marketing plan designed solely by Red Bull, that included, but was not limited to requirements that:

      a.   KC service the market with a business system of employees and equipment dictated by Red Bull and dedicated solely to the sales and delivery of the Red Bull products;

---

[2] "Territories" shall reference Wilbarger, Wichita, Baylor, Archer, Clay, Montague, Cooke, Denton, Grayson, Collin, Fannin, Lamar, Red River, Franklin, Delta, Foard, Hardeman, and Knox Counties.
[3] Each van cost $31,129.02.
[4] Each storage pod cost $3,500

    b.  KC deliver the Red Bull products in vehicles prescribed by Red Bull and decorated with Red Bull logos designed by Red Bull;

    c.  KC employees dedicated to the Red Bull business undergo extensive training in the Red Bull marketing system;

    d.  KC employees dedicated to the Red Bull business wear uniforms prescribed by Red Bull;

    e.  KC decline business and other opportunities to represent other beverage brands; and,

    f.  All aspects of KC's record keeping, reporting and execution of the Red Bull business be in accordance with procedures dictated by Red Bull.

25.     As a further inducement into the partnership with Red Bull and to getting the rights to distribute Red Bull products, KC was required to expend substantial amounts of money, including but not limited to:

    a.  Hiring new employees;

    b.  Purchase and lease Red Bull delivery vehicles;

    c.  Purchase of uniforms for Red Bull dedicated employees;

    d.  Costs associated with the training of dedicated Red Bull employees, including travel, and personnel time and resources;

    e.  Purchase of Red Bull promotional and advertising materials, and equipment;

    f.  Contribution to retailer promotional and shelf space programs determined by and negotiated by Red Bull, including payments to retailers for placement of the Red Bull products in their stores, with free products to retailers; and,

g.  Participate in special discount pricing to "special" customers that Red Bull might devise unapproved by KC.

**Leading Up to and Throughout 2020 – KC Was Performing Above and Beyond Expectations**

26.      Year after year since 1997, KC has consistently exceeded Red Bull's performance and sales levels. KC has consistently been one of the top Red Bull performers in the United States. Since 1997, and throughout KC's tenure as a Red Bull distributor, Red Bull's distribution in the Territory has experienced enormous success.

27.      KC always performed when it came to aggressively marketing and promoting the Red Bull brand in its Territories. Red Bull, however, would make sporadic and unreasonable demands upon KC, which resulted in KC incurring significant additional costs.  For example, in 2009, Red Bull sent KC a letter requiring it to immediately provide "climate control" to ease the sensitivity from Aspartame in Red Bull Sugar Free products, which KC implemented, spending $32,829.88. KC was one of the few distributors to succumb to Red Bull's request, and unbeknownst to KC, not even the Red Bull corporate owned distributors adhered to Red Bull's demand.  This is one of many instances wherein Red Bull misrepresented matters to KC, its ultimate distribution partner who performed in good faith and promoted the Red Bull brand in its Territories throughout Texas.

**KC Saved the Day When Red Bull's Dallas & Tarrant County Distributor Parted Ways**

28.      In 2017, an independent Red Bull distributor for Dallas and Tarrant Counties returned its Red Bull distributor to Red Bull. This caused panic among Red Bull's corporate office because it did not have the infrastructure in place to distribute to Dallas and Tarrant Counties. Red Bull reached out to KC, and induced KC to step in as a "good partner" and distribute to parts of Dallas and Tarrant Counties in the on-premise category until Red Bull could replace the

---

distributor.[5] KC, as the "good partner," agreed, and successfully distributed Red Bull throughout Dallas and Tarrant Counties, which significantly strained all of KC's available resources and employees. KC was required to increase its investment and purchase more vans and hire more employees as a result of taking on the larger territory base.

29.     It was during this time that Red Bull headquarters began contemplating setting up its own corporate-owned distributors and cutting out KC. In order to achieve this, Red Bull headquarters carefully studied KC's setup, and its marketing and sales strategies.

30.     It was during this time that KC requested assurances from Red Bull that KC was not at risk of being terminated because KC did not want to increase its investments into Red Bull even greater if Red Bull had any intent to terminate their partnership. Fishlock, Red Bull's Director of Partnership Distributorship, reiterated to KC that the KC-Red Bull partnership was not at risk, and in fact stated: "we need our partners more than ever," and asked KC to "step up as Red Bull's partner" and increase its investment.

31.     KC requested to keep and take over the Dallas and Tarrant County Territories to no avail.  Red Bull saw "MONEY," and a way to profit at the expense of KC, its independent distributor in place. Independent distributors are crucial in a fair, free and competitive marketplace. Corporate-owned distributors have been frowned upon as an unlawful restraint of trade that generally restrict a competitive marketplace and results in price-gouging.  It was during this time that Red Bull became increasingly hostile toward the distributors in an effort to take over territories with its wholly-owned distributors.

32.     After obtaining valuable knowledge, trade secrets and confidential and proprietary information from KC and other independent distributors, Red Bull created A Red Bull Distribution

---

[5] KC, as a good partner, also offered to distribute Red Bull products to off-premise locations.

Company (**"RBDC-North Texas/Northeast Texas"**), which would also serve portions of Dallas[6] and Tarrant Counties from KC despite its commitment and success in those counties. KC spent substantial money in partnering with Red Bull in 2017-2018 at the behest of Red Bull to serve its Territories. Rather than reward KC for relying on Red Bull's representations and KC's enormous investments and efforts to market and promote the sale of Red Bull products, Red Bull began to create its wholly-owned distributing companies to take over and in an effort to destroy family-owned independent distributors, including specifically KC.

**Defendants Continued to Make Representations Confirming KC-Red Bull's Continued Partnership & Praise KC's Top Performance Numbers**

33.     During a golf outing on May 17, 2019, Red Bull's Distributor Partner Manager, Matt Carpenter, asked Clymer whether KC would be willing to make an additional investment and take on an additional territory in Oklahoma, wherein Clymer affirmatively agreed to take on the additional territory.  KC was always willing to do anything to benefit and promote the Red Bull brand.

34.     On June 4, 2019, Joe Waters once again praised KC's performance efforts, complimenting that KC's efforts contributed to Red Bull's strongest performance since 2015, and was a leader in sales. In that June 4, 2019 letter to KC, Waters once again reiterated KC's and Red Bull's partnership and plans to continue strong performance and growth in 2020 and in future years.

35.     On September 28, 2019, a special marketing event known as SoapBox was held in KC's market. This involved corporate Red Bull executives surveying customers in how the distributor measures up in service, marketing, and providing fixtures to push Red Bull products to

---

[6] In an April of 2018 Amendment, Red Bull granted KC rights to a portion of Dallas and Denton Counties on the grounds that the territories were "shared," thus, blurring the rights of the parties as to transshipping.

the end-consumer.  The SoapBox Survey was held in KC's Territories on September 27, 2019. Red Bull had several Red Bull employees, including Waters, Vanderlinden, Fishlock, Haight, Carpenter and a few new hires visited and conducted the Survey in KC's market.

36.      In preparation for the Survey and the SoapBox, KC secured extensive executions at the store level for forty-five (45) days prior to the SoapBox.  KC recognized the importance of the Survey, and worked closely in the market with Carpenter and Haight to ensure that the Red Bull executives approved KC's executions. Haight and Carpenter, as late as the day before the Survey, handpicked the exact accounts that Red Bull executives would visit during the Survey. Haight personally went to those accounts the day before the Survey to ensure KC's execution resulted in superior execution. Notwithstanding the fact that Haight and Carpenter handpicked the thirteen stores that Red Bull executives visited to reflect KC's superior execution, Waters surprisingly found fault with some of KC's executions even though KC's execution was above par.  This is one of many examples of Red Bull's inconsistent and conflicting leadership.

37.      Approximately a month after the Survey, on October 17, 2019, Clymer met VanderLinden for breakfast at Snooze in Addison, Texas. During this breakfast, they discussed KC's plans for the future, and did nothing but confirm and represent to Clymer that KC's future was bright with Red Bull, and there was no risk of termination. During this breakfast, Clymer advised VanderLinden that KC intended to add an additional layer of management, costing approximately $150,000 per a year.  VanderLinden represented and induced KC to move forward with all the intended investments into the Red Bull distributorship, including the new layer of management. KC's increased investments and expenditures included personnel, overhead, new organizational structure changes, and construction costs – all of which VanderLinden and Red Bull approved and encouraged KC to undertake.

38.      That very same day, KC received a letter from Mr. VanderLinden that attached the market review that had been performed in September. The letter stated:

> Thank you for sharing the plans you are going to implement to improve performance. I had a chance to review the 30-60-90 leave behind and know a lot of work went into setting these objectives. I look forward to seeing the execution based on the goals/kpi's you and your team have outlined and approved 30-60-90 day objectives.

39.      On November 20, 2019, KC and Red Bull had their 2020 Business Plan meeting in downtown Dallas, Texas. On behalf of Red Bull, David Fishlock, Nick VanderLinden, Matt Carpenter and Travis Haight were present.  On behalf of KC, Mr. Clymer, Darby Carmichael, Barry Rutherford, and James Coffey were in attendance to present the KC 2020 Business Plan. KC's Business Plan was approved by each and every Red Bull representative.

40.      KC's 2020 Business Plan included KC's immediate investments into the Red Bull distributorship to continue to build the Red Bull brand and the business. During this November 20, 2019 meeting, Clymer went over the new warehouse plans, and the naming of Mr. Darby Carmichael as KC's President and Clymer as Chief Executive Officer.  Red Bull executives approved those structure changes, and instructed KC to move forward. In reliance on these material representations and inducements, KC increased its business expenses, and expended significant funds in building the new warehouse – all of which were induced, approved and encouraged by Red Bull. Clymer, once again, went over the increased investments and expenditures that KC would incur as a result of the additional personnel, overhead, and construction costs, which were induced, approved and encouraged by Red Bull and the individual Defendants. Carpenter and Haight also approved and encouraged KC's investments before the November 20, 2019 meeting.

41.     Preceding this period of time, Mr. Clymer's son, Taylor, was also part of the KC team. It was understood that he one day would take over his father's position in running the KC distributorship.  Red Bull represented that they welcomed this transition.

**Red Bull Expressly Modified Any Right to Voluntary Terminate the Distributorship in 2020 by Accepting KC's 2020 Business Plan**

42.     Red Bull executives continuously modified the termination clause in the 2008 Distribution Agreement by promising KC it was not under any threat of being terminated.  Red Bull ratified this agreement by expressly approving and agreeing to KC's 2020 Business Plan for the 2020 year, and representing to KC that it continued to have a bright future and partnership with Red Bull.

43.     Red Bull's express approval of the Business Plan was an express modification of the Distribution Agreement's termination clause wherein Red Bull agreed to continue KC's distribution of Red Bull for the 2020 year and for the life of the new capital expenditures. Red Bull, its executives, and agents routinely and consistently told KC that it was not in danger of termination because the 20 plus year franchise was a key component of Red Bull's growth and success not only in Texas, but nationally.

**Tragedy Strikes**

44.     In early December of 2019, Clymer's son, Taylor, was diagnosed with Lymphoma. In mid-to-late December of 2019, Travis Haight acknowledged that he and other Red Bull executives became aware of Taylor's diagnosis.

**Out-of-Nowhere Notice of Termination**

45.     Contrary to Red Bull, Fishlock, Waters, VanderLinden, Carpenter, and Haight's continued representations to KC and its officers that KC was not at risk of being terminated, KC received a termination notice on February 13, 2020 shortly after Red Bull learned of Taylor's

cancer diagnosis. The termination letter stated that Red Bull was voluntarily terminating the 2008 Distributor Agreement effective May 1, 2020.

46.     Even after receiving the notice of termination, KC remained a motivated and good partner, investing in the Red Bull Brand. For instance, on February 18-19, 2020, KC sent a Red Bull representative for Walmart training in Oklahoma City at KC's expense. Red Bull offered no reimbursement of expenses.

47.     Red Bull's termination is at odds with Red Bull's partnership agreement and modification of the Distribution Agreement when it accepted and approved KC's 2020 Business Plan in late 2019. This "voluntary" termination is also a breach of the Defendants' promises to KC that it would not be terminated without cause.

48.     While Taylor was undergoing cancer treatments, Kelly Clymer remained the President of KC with Darby Carmichael, a former Red Bull corporate executive, who serves as KC's General Manager. Beyond comprehension and compassion and on information and belief, Red Bull discriminated against and penalized KC when Taylor was diagnosed with cancer and undergoing chemotherapy.

**World Pandemic Covid-19 Hits & Disrupts**

49.     Despite Red Bull's unilateral and wrongful termination of KC's partnership and Distribution Agreement that was to go into effect on May 1, 2020 – disaster hit when Covid-19 hit the United States, creating a national pandemic.  Facing a crisis, Red Bull desperately needed KC's assistance, and requested in March, 2020 that KC ignore the express terms of the Red Bull termination letter and continue as Red Bull's partner up through the end of June of 2020 with a new "termination date" of July 1, 2020.

---

50.      As the healthcare and economic crisis grew each day, KC continued to distribute Red Bull products throughout Texas with continued success and outperformed every other Red Bull distributors, including RBDC-North Texas-Northeast Texas, who is purportedly taking over KC's Territories on July 1, 2020. To continue the partnership past the May date came at a significant expense to KC, which included hiring additional employees and incurring heavy operating overhead costs. This also caused serious emotional anxiety and mental distress upon KC's executive team and employees.

**KC'S Exceptional Service and Market Share in Their Territories**

51.      A recent example of KC's continued exceptional service was relayed by Haight on April 20, 2020, wherein he wrote the following:

> Ran Pivot Report this week after taking week off to see what the numbers were doing out there. KC Team showing awesome execution out there, and paying off in the numbers. Numbers don't lie and you guys can clearly see the excel document with KC at or above the National Numbers and kicking the [s**t] out of the RBDC Teams.

52.      Red Bull highlighted KC as exceeding its April in-store executions targets. In March, 2020, KC increased its sales by more than seventeen percent (17%) in the Red River region compared to Red Bull's wholly-owned distributors' six percent. Recognizing and confirming the parties' partnership, Red Bull's representatives sent the following email out to its partners:

> Distributor Partners,
> While the last couple of weeks have presented many challenges and disruption in our professional/work lives, there has been one piece of the business that we have been able to rely on and is a point of great pride for the Red River Region…**our distributor partners!** Red Bull and its athletes wanted to put together a quick video to share our appreciation for your efforts and being the true heroes of this organization.  Please cascade our deepest gratitude and this video to your teams, hopefully it helps express our appreciation for a job well done!

53.     On May 29, 2020, KC set a record, selling the most cases ever in a single day --
5,217.37 cases – all while KC's employees are worried about future employment, and Red Bull is
literally stripping product and profits from KC through short orders, and diverting those profits to
RBDC.  This is another example of KC continuing to be a good partner up and through the end.

**Red Bull Employee Intimidation**

54.     Red Bull regularly employs intimidation and bullying tactics. On May 27, 2020,
Haight, contrary to Red Bull's policy of not visiting any distributors until June 1, 2020 due to the
Covid-19 virus, visited KC's warehouse.   Haight then proceeded to verbally assault KC's
employees criticizing their time management and execution in general without fair inquiry. Haight
made several false accusations concerning various employees without basis. Despite the pandemic
and the ongoing crisis that made regular sales more difficult than usual, Haight berated KC's
employees, and intimidated them with threats of their potential future employment with RBDC-
North Texas/Northeast Texas when it takes over KC's Territories on July 1, 2020. These
interviews were ongoing during the time Haight berated KC's employees without any basis.
Haight's verbal assault and threats – during a crisis where KC's employees desperately need
employment – is only one of the many examples of Red Bull's intimidation tactics.

55.     Red Bull also routinely provides conflicting and incorrect directions.  On February
20, 2020 – seven days after receiving the termination notice – Haight visited a Walmart in KC's
Territory. Haight completely reset KC's section and informed the team leader, Brett Taylor, that
it was set incorrectly. After Taylor presented Haight with Red Bull's own planogram for this store,
it proved that Taylor's execution was correct. Taylor was forced to change it back after Haight
improperly changed it.

**Red Bull Continues To Breach Its Distribution Agreement and Ruin KC's Cash Flow During Turbulent Times**

56.      In further contravention of the Distribution Agreement, Red Bull continued to take EFT ACH draws earlier than allowed under the Agreement. Red Bull continued to automatically withdraw payments from KC's bank account when specifically disallowed under the terms of the Agreement.

57.      In particular, on April 6, 2020, Red Bull placed a draw on KC's bank account for a next-day payment of an Order that was received at KC's warehouse on March 9, 2020, and pursuant to the contract, was eligible for EFT payment on April 8, 2020. By automatically withdrawing payments from KC's bank before the date allowed by the contract it caused disruption in KC's cash flow especially during the turbulent times of the Covid-19 crisis.

58.      Again, on April 13, 2020, Red Bull sought to draft more than $80,000 for an order that was not yet due under the parties' Distribution Agreement.  Again, on June 1, 2020, Red Bull sought to draft $77,732.44 two days before it was due under the parties' Distribution Agreement. Due to potential retribution from the monstrous Red Bull, KC did not deny Red Bull's continuous early withdrawals despite the epidemic facing the entire world, especially on small businesses such as KC.

**Red Bull Breached the Distribution Agreement By Shorting Product Orders**

59.      The 2008 Agreement further mandates that KC Distributor Partners "maintain in-stock conditions" in all retail accounts, and avoid out-of-stock conditions. However, Red Bull consistently and continuously shorted KC's inventory orders in favor of RBDC-Dallas or other Red Bull wholly-owned distributors.  This resulted in a loss of sales and profits for KC.

**Improper Restraint of Trade**

60. Since 2008 up through the July 1, 2020 termination date, the Red Bull business has come to dominate KC's business as a result of Red Bull's restraint of trade of allowing KC to distribute other beverages that did not compete with Red Bull or classified as an "energy drink." In fact, Red Bull refused to allow KC to distribute any other beverage brand.

61. Red Bull's overly broad definition of "Competitive Product" constitutes an unlawful restraint of trade, and resulted in substantial loss of business opportunities for KC. The Distribution Agreement states:

> Competitive Product includes every beverage, non-beverage food and other category of goods, which claims to improve personal energy, physical or cognitive performance, endurance, vitalization or offer comparable benefits regardless of how or where the claims are made or who makes the claims. Additionally, if [Red Bull] makes Red Bull Cola available to [KC]for sale in the Territory, the parties agree that Competitive Product shall then be expanded to include every cola soft drink and cola beverage. For purposes of clarifying the scope of goods included within the definition of Competitive Product, the parties understand and agree that Competitive Product includes, without limitation, any beverage (whether alcoholic or non-alcoholic, carbonated or non-carbonated or formulated or possessing any other distinguishing characteristic) and non-beverage food or other category of goods regardless of the format in which it is sold or packaged (for example, regardless of whether in ready-to-drink, ready-to-consume, concentrate, power, frozen, missed with another beverage of some kind, or in any other format) and whether or not the goods are manufactured, distributed, marketed, advertised or sold on the Effective Date or first manufactured, distributed, marketed, advertised or sold during the Term.

62. KC was forced to refuse numerous other business opportunities representing other brands because Red Bull determined them to be competitive even when they were not. For example, Red Bull precluded KC from distributing Lisa's Lemonade, Earthwater, Hawaii Brewing Company, Think Jerky, Evamore, Aquahydrate, and many other beverage brands that do not compete with Red Bull and are not "energy drinks."

63.      More than 140 years ago, California's Legislature addressed this problem and declared contracts in restraint of trade void. *See* Bus. & Prof. Code § 16600. Section 16600 reflects a fundamental public policy decision by the California Legislature in favor of free competition Red Bull has violated California's unfair competition law and public policy against restraints of trade by restricting KC from distributing non-competitive beverages.  Red Bull's purpose in restricting KC from distributing non-competitive beverages was for the sole purpose of suppressing competition and restricting the mobility of KC

64.      Red Bull also continued to price squeeze KC's margins.  At the onset, KC's margins were 33%, but Red Bull squeezed KC down to a 19% margin in 2020.

65.      Red Bull also used unfair business practices to keep pressure and increase emotional strife on KC.  Since April 18, 2017, KC has invoiced Red Bull for monies due to them in retail and pricing agreements 562 times in the amount of $3,307,332.96.  Red Bull, however, has failed to make timely payments to KC.  Red Bull failed to remit payment to KC within the standard 30-day window for more than seventy-five percent (75%) of these invoices, which amounted to $2,362,687.17. These late payments has seriously affected, and continues to affect KC's cash flow, and its relationship with its Bank.

## V.      CAUSES OF ACTION

## A.      BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING (AGAINST RED BULL)

66.      Plaintiff incorporates by reference each of the above paragraphs as if set forth in full.

67.      The terms of the Agreement between KC and Red Bull, and specifically Section VIII.B thereof were authored by Red Bull representatives, and were not subject to substantial negotiations or input from KC.

68.      Section VIII.B purports to repose in Red Bull unfettered discretion to terminate the Agreement at its will, without cause or explanation.

69.      The Agreement, and specifically Section VIII.B is subject to the covenant of good faith and fair dealing implied under law, which covenant imposes on Red Bull the obligation of exercising its discretion in good faith, and only for good business reasons in a manner that is fair and reasonable to KC under the circumstances.

70.      At all times in entering the Agreement, and in performance thereunder, KC relied upon the obligations of good faith and fair dealing imposed by the law on Red Bull, and specifically, in making investments in the Red Bull business and declining other business opportunities, KC relied on the implied obligation that Red Bull would not terminate the Agreement except for good business reasons concerning KC's performance thereunder.

71.      Red Bull's acts in terminating the Distribution Agreement are a violation of the covenant of the good faith and fair dealing in one or more of the following ways:

    a.   In that the termination is not based upon good business reasons concerning KC's performance under the Agreement;

    b.   In that the termination is an attempt by Red Bull to take for the benefit of itself and its insiders, the valuable business created by KC's investments, good-will and hard work in the Territory, without just cause or compensation;

    c.   In that in anticipation of its intended termination, and without disclosing the same to KC, Red Bull demanded that KC make substantial investments of time and money in the Red Bull business, with the intent and effect that these would inure to the benefit of Red Bull and its insiders, to the detriment of KC;

d.  In that Red Bull has engaged in a strategy of fraud, misrepresentations, concealment and disassembling to protect its own interests and the interests of its insiders, knowing that the resulting impact of the termination on KC would be devastating to KC's business;

e.  In that the timing and manner in which the termination was effected were designed to, and/or had the effect of not allowing KC to make alternative plans for its business, and thereby reduce the chance that KC would have an opportunity to take on another product or products that would compete with Red Bull in the marketplace; and,

f.  In that the acts were intentional, malicious and in bad faith.

72.    The conduct of the Defendant Red Bull is in violation of the covenant of good faith and fair dealing and has caused, and will cause, KC to incur substantial actual and consequential damages, including the virtual destruction of KC's distributing business.

**B.    FRAUDULENT MISREPRESENTATION (AGAINST RED BULL, HAIGHT, CARPENTER, FISHLOCK, WATERS AND VANDERLINDEN)**

73.    Plaintiff incorporates by reference each of the above paragraphs as if set forth in full.

74.    Defendants Red Bull, Haight, Carpenter, Fishlock, Waters and VanderLinden negligently misrepresented the matters detailed above in which Defendants had a pecuniary interest.  Defendants provided the false information for the guidance of KC in its business decisions, and Defendants did not exercise reasonable care or competence in obtaining or communicating the information to KC.  In particular, each of the Defendants, individually and as agents of Red Bull made the following representations of material facts to KC's officers:

a.  That KC was not at risk of having its distribution rights terminated by Red Bull;

---

    b.  That KC had the full rights to distribute Red Bull in its Territories without concerns of transshipping;

    c.  That KC should continue to make large financial investments into KC and Red Bull as a partner to Red Bull; and,

    d.  That KC's 2020 business plan was approved for the entire 2020 year and for future years.

75.    Each of the Defendants' representations were false when they were made, and were known by each of the Defendants to be false, and/or were made recklessly without knowing whether they were true or false.

76.    Each of the Defendants intended that KC would rely on the truth of the representations.  KC relied upon the false representations in making additional investments of money, resources, and personnel in the Red Bull business, and in not exploring alternative business plans.

77.    The false representations were made by each of the Defendants in furtherance of their personal interests as well as in furtherance of the interest of their principal, Red Bull.

78.    As a result of the Defendants' fraudulent misrepresentations, KC has suffered substantial economic losses, including but not limited to the following:

    a.  Loss of capital contributions;

    b.  Lost business opportunities;

    c.  Loss of accounts;

    d.  Loss of sales;

    e.  Lost account payables; and,

    f.  Lost profits.

79.     KC has suffered pecuniary loss by justifiably relying on the representations and omissions of the Defendants. Accordingly, Plaintiff suffered actual, consequential, exemplary and special damages in excess of the minimum jurisdictional limits of this Court for which they hereby sue.

## C.     ANTICIPATORY BREACH OF DISTRIBUTION AGREEMENT (AGAINST RED BULL)

80.     Plaintiff incorporates by reference each of the above paragraphs as if set forth in full.

81.     KC and Red Bull entered into a contract in the form of a Distribution Agreement.

82.     Under the express terms of the Distribution Agreement, KC was given the right to distribute Red Bull products in the Territories.

83.     At all times, KC has performed its obligations under the Agreement in a satisfactory manner.

84.     While in the course of performing its obligations under the Distribution Agreement, KC was advised by Red Bull that it no longer intended to perform its obligations under the Agreement. Red Bull's breach was for the purpose of self-dealing and profit from and through its wholly-owned distributor by removing KC as a competitor.  Red Bull's breach of contract and anticipatory breach of contract is a material breach of the Agreement.

85.     Red Bull's anticipatory breach of the Distribution Agreement entitles KC to breach of contract damages.   KC's financial loss exceeds Thirty Million Dollars.

86.     KC seeks its actual damages, its lost profits, future lost profits, and any and all other damages KC has suffered as a result of Red Bull's breach.  KC further seeks its attorneys' fees, and its pre and post-judgment interest.

### D.     BREACH OF CONTRACT (AGAINST RED BULL)

87.     Plaintiff incorporates by reference each of the above paragraphs as if set forth in full.

88.     KC and Red Bull entered into a Distribution Agreement wherein KC was given the right to distribute Red Bull products in its Territories.  At all times, KC performed its obligations under the Agreement in a satisfactory manner.   Red Bull materially breached the Distribution Agreement in one or more of the following ways:

   a.   Failing to supply KC with sufficient products to maintain in-stock conditions for certain Red Bull Products, which resulted in out-of-stock conditions, thus resulting in a loss of sales to KC;

   b.   Withdrawing funds from KC earlier than prescribed under the Distribution Agreement, resulting in loss of cash flow;

   c.   Failing to reimburse KC for billbacks in a reasonable and timely manner;

   d.   Failing and refusing to perform its obligations under the Distribution Agreement;

   e.   Refusing to continue the distribution relationship between the parties;

   f.   Precluding KC from distributing beverages that were not competitive with the Red Bull products, thus resulting in loss of business opportunities;

   g.   Failing to halt transshipping of Red Bull products into the Territories by Red Bull's wholly-owned distributors;

   h.   Self-dealing; and,

   i.   Breaching its obligations of good faith and fair dealing.

89.     As a result of Red Bull's breaches of the Distribution Agreement, KC has suffered damages.  These damages include, without limitation, loss of capital contribution, loss of sales,

loss of accounts payable, lost business opportunities, loss of profits and future profits, and loss of business reputation. KC seeks damages in excess of the jurisdictional limits of this Court.

E.   **COMMON LAW FRAUD/FRAUD BY NON-DISCLOSURE (AGAINST RED BULL, HAIGHT, CARPENTER, FISHLOCK, WATERS AND VANDERLINDEN)**

90.   Plaintiff incorporates by reference each of the above paragraphs as if set forth in full.

91.   At all times during the negotiation of the agreements between KC and Defendants, Defendants represented to KC and knew or had reason to know that if KC would invest substantial amounts of money into the development and growth of its Territories by, among other things, hiring and training staff, acquiring vehicles and other equipment, and renting warehouse and office space, KC would be allowed to keep its distribution Territories and operate them for profit, Defendants would provide assistance to KC in those operations and Red Bull would split certain promotional costs with KC.

92.   Defendants knew or had reason to know that KC was making these substantial investments based on the promises by Red Bull that it would act in good faith, deal fairly with KC and allow KC the opportunity to operate its distributorships for profit and provide the promised assistance to KC. Defendants continued to make such representations in order to induce KC to make additional investments over time. Defendants, however, did not live up to their promises when they not only failed to provide support to KC, ceased paying certain promotional costs as agreed, unfairly refused to allow KC to take certain cost increases to its customers, ceased reimbursing KC for certain products and other promotional activities Red Bull promised to customers, but also when they terminated KC's contract when Red Bull expressly approved its 2020 business plan, and expressly reiterated the parties' successful partnership while advising KC that it would never be terminated as a Red Bull distributor.

---

PLAINTIFF'S ORIGINAL PETITION                                   Page 26 of 34
#901896

93.     KC made it known to these Defendants from the beginning of their relationship that its interest in having a Red Bull distributorship was for a long-term relationship, which is the only way that the type of investment it takes to start such an operation will bring enough profits to recoup said costs.  KC also made it known to Defendants that it was relying on Defendants' promises that it would not be terminated in continuing to make said investments.  Defendants' conduct also constitutes Fraud by Non-Disclosure.

94.     KC justifiably relied on these Defendants' promises and misrepresentations by these Defendants, and as a direct result, KC suffered actual, consequential, exemplary and special damages in excess of the minimum jurisdictional limits of this Court for which they hereby sue.

**F.     BREACH OF PARTNERSHIP AGREEMENT (AGAINST RED BULL)**

95.     Plaintiff incorporates by reference each of the above paragraphs as if set forth in full.

96.     As set forth herein, KC and Red Bull entered into an oral partnership agreement/joint venture.  Red Bull confirmed the parties' partnership multiple times throughout their almost 22-year relationship.  The parties agreed that KC would be the distributor of Red Bull products in its Territories, and their partnership in this regard would not terminate without cause. KC fully performed under the parties' partnership agreement.  Red Bull breached the partnership by terminating the agreement without cause.

97.     KC has been injured as result of Red Bull's breaches, and KC seeks its actual and consequential damages in an amount in excess of the minimum jurisdictional limits of this Court. KC further seeks recovery of its attorneys' fees, and pre and post-judgment interest.

G.   **UNJUST ENRICHMENT (AGAINST RED BULL)**

98.      Plaintiff incorporates by reference each of the above paragraphs as if set forth in full.

99.      By its conduct, Red Bull has diverted KC's business to its wholly-owned distributor, and Red Bull has profited by its diversion of KC's business.   The acts, conduct and statements of Red Bull as described above have unjustly enriched Red Bull at the expense of KC, and KC has been damaged thereby.

H.   **TORTIOUS   INTERFERENE   WITH   ADVANTAGEOUS   BUSINESS RELATIONSHIP   OR   EXPECTANCIES   (AGAINST   RBDC-NORTH TEXAS/NORTHEAST TEXAS, HAIGHT, CARPENTER, FISHLOCK, WATERS AND VANDERLINDEN)**

100.      Plaintiff incorporates by reference each of the above paragraphs if set forth in full.

101.      Under the terms of the parties' agreements, KC was given the right to distribute Red Bull products in its Territories.

102.      At all times, KC has performed its obligations under the Distribution and partnership Agreements in a satisfactory manner.

103.      David Fishlock, Joe Waters, Haight, Carpenter, and RBDC-North Texas/Northeast Texas solicited and induced Red Bull to terminate the Agreements without cause or justification, in order to obtain for their own benefit the distribution rights in the Territories, and to eliminate KC as a competitor.

104.      KC's business relationships and expectancies under the Distribution and Partnership Agreements had a reasonable likelihood of future economic benefit for KC.

105.      Defendants knew of the business relationships and expectancies between KC and Red Bull.

106.     By their conduct, Defendants intentionally and improperly interfered with the business relationships and expectancies between KC and Red Bull.

107.     As a direct and proximate result of Defendants' wrongful conduct, KC has suffered substantial economic injury, loss of goodwill, harm to its business reputation, loss of business opportunities, and damaged KC's banking relationships. Accordingly, KC has suffered actual, consequential, incidental, special and exemplary damages in excess of the minimum jurisdictional limits of this Court which it hereby sues.

## I.     NEGLIGENT MISREPRESENTATION (AGAINST (AGAINST RED BULL, HAIGHT, CARPENTER, FISHLOCK, WATERS AND VANDERLINDEN)

108.     Plaintiff incorporates each of the above paragraphs as if set forth in full.

109.     Defendants negligently misrepresented the matters detailed above in transactions in which Defendants had a pecuniary interest.  Defendants provided the false information of the guidance of KC in its business decisions, and Defendants did not exercise reasonable care or competence in obtaining or communicating the information to KC.

110.     KC has suffered pecuniary loss by justifiably relying on the representations and omissions of Defendant. Accordingly, KC has suffered actual, consequential, incidental, special and exemplary damages in excess of the minimum jurisdictional limits of this Court which it hereby sues.

## J.     UNFAIR TRADE PRACTICES (AGAINST RED BULL & RBDC-NORTH TEXAS/NORTHEAST TEXAS)

111.     Plaintiff incorporates by reference each of the above paragraphs as if set forth in full.

112.     During the course of its performance under the parties' agreements, upon the demand of Red Bull, KC provided to Red Bull certain valuable information about KC's business,

which KC considers confidential and trade secrets, including but not limited to customer lists that included information as to customer contracts and customer purchase histories.

113.     Upon information and belief, Red Bull and the Defendants have provided some or all of this confidential information to RBDC-North Texas/Northeast Texas, whom upon information and belief, has used, or will in the future use this information to compete with KC.

114.     The foregoing conduct by the Defendants, including the manner and timing of the termination of the Agreements, the interference with business relationships, fraudulent misrepresentations, use of confidential information and trade secrets, and breach of the covenant of good faith and fair dealing, constitute unfair and deceptive trade practices in violation of common law and/or California Business and Professional Code sections 17200, *et. seq.*

115.     As a result of the foregoing unfair and deceptive trade practices by the Defendants, KC has suffered actual, consequential, incidental, special and exemplary damages in excess of the minimum jurisdictional limits of this Court which it hereby sues.

## K.     UNFAIR COMPETITION (AGAINST RED BULL)

116.     Plaintiff incorporates by reference each paragraph above as if set forth herein.

117.     Red Bull's use of restrictive covenants precluding the sale of any other non-competitive beverage as a condition of the Distribution Agreement violates California's unfair competition law and public policy against restraints of trade.

118.     KC has been injured, *inter alia,* such restrictive covenants stifle competition, chill the free flow of commerce, reduce employment opportunities, and increase the risks and costs of pursuing other distribution agreements after Red Bull's wrongful termination.

119.     KC has suffered monetary losses, including lost profits, from Red Bull's unfair competition in an amount that exceeds this Court's jurisdictional limits. KC has also incurred attorneys' fees.

## L.     PROMISSORY ESTOPPEL (AGAINST RED BULL)

120.     Plaintiff incorporates by reference each paragraph above as if set forth herein.

121.     Pleading in the alternative if same be necessary, Red Bull through its authorized agents made a promise to KC that it would distributorship would not be terminated by Red Bull, and encouraged and advised KC to move forward with hefty future investments in a warehouse, additional employees, among many other things. KC provided Red Bull with valuable services and products, and substantial investments in the Red Bull brand.  KC's reliance was foreseeable by Red Bull, and injustice can only be avoided by enforcing the Defendants' promise.

122.     Accordingly, KC suffered actual, consequential and special damages in excess of the minimum jurisdictional limits of this Court for which it hereby sues.

## M.     BREACH OF FIDUCIARY DUTY (AGAINST RED BULL)

123.     Plaintiff incorporates by reference each paragraph above as if set forth herein.

124.     KC had a fiduciary relationship with Red Bull. As partners, Red Bull had a fiduciary duty relationship with KC. Red Bull owed KC a fiduciary duty as a matter of law, including (a) the duty of loyalty and utmost faith in Red Bull's relations to the partnership; (b)the duty to refrain from self-dealing; (c) the duty of candor; (d) the duty of fair and honest dealing; (e) the duty of loyalty; and (f) the duty of full disclosures.

125.     Red Bull (by and through its agents) breached its fiduciary duties to KC from the moment KC entered into the partnership with Red Bull. Red Bull owed KC a fiduciary duty, including a duty of candor and a duty of full disclosures. By wrongfully terminating the distribution

agreement and the partnership agreement in favor of its wholly-owned distributing company and for its own financial gain and benefit and to KC's detriment constitutes a breach of fiduciary duty. Red Bull engaged in self-dealing.

126.     KC has suffered actual, consequential and exemplary damages as a result of Red Bull's breach of fiduciary duty.

## VI.     DAMAGES

127.     Defendants' conduct caused KC the following damages:

a.  KC lost the value of its Territories totaling at least $25,000,000 in compensatory damages, including lost profits;

b.  KC has suffered a loss of good will in an amount to be determined by the jury;

c.  KC has lost the funds invested in starting KC totaling at least $ 2,500,000;

d.  KC has lost business opportunities in an amount to be determined by the jury;

e.  KC has lost substantial investments made in expanding KC's warehouse and market totaling at least $1,500,000;

f.  KC has not been reimbursed in billbacks and other required expenses totaling at least $53.054;

g.  KC had to incur the cost of closing totaling at least $2,000,000; and

128.     Reasonable attorneys' fees.

129.     KC's damages are in excess of the minimum jurisdictional levels of the Court.

## VII.     EXEMPLARY DAMAGES

130.     The acts and omissions of Red Bull complained of herein were committed knowingly, willfully, intentionally, with actual awareness, and with the specific and predetermined intention of enriching Red Bull at the expense of KC. In order to punish Red Bull for such

unconscionable overreaching and to deter such actions and/or omissions in the future, KC also seeks recovery from Red Bull for exemplary damages as provided by Chapter 41 of the Texas Civil Practice and the Texas Constitution.

## VIII.   ATTORNEYS' FEES AND COSTS

131.     Request is made for all costs and reasonable and necessary attorneys' fees incurred by or on behalf of Plaintiffs herein, including without limitation all fees due for Red Bull's breach of contract, and all fees necessary in the event of an appeal of this cause to the Court of Appeals and the Supreme Court of Texas, as the Court deems equitable and just.

## IX.    EQUEST FOR JURY TRIAL

132.     KC hereby request a jury trial on all liability and damage issues, including the imposition of exemplary damages, if any.   Plaintiffs accordingly request that all disputed fact issues be heard before a properly empaneled jury in this case.

## X.    REQUEST FOR DISCLOSURES

133.     Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Defendants are hereby requested to disclose the information or material described in Rule 194.2.   This is a continuing duty and requires supplementation in accordance with the Texas Rules of Civil Procedure.

## XI.    REQUESTS FOR DOCUMENT PRODUCTION

134.     Per Rule 196.2, KC Distributing serves these First Set of Requests for Document Production upon each of the Defendants, which are attached herein as Exhibit A, and incorporated herein as if set forth in full.

## XII.   PRAYER

WHEREFORE, KC Distributing Company, LLC respectfully prays that the Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered

for the Plaintiff against Defendants for damages requested hereinabove in an amount in excess of $30 million dollars in actual and compensatory damage and additional damages, together with pre-judgment and post-judgment interest at the maximum rate allowed by law, costs of suit, attorneys' fees, costs of court, and such other and further relief to which the Plaintiff may be entitled at law or in equity, whether pled or unpled.

By: */s/ Shauna A. Izadi*

**LAWRENCE J. FRIEDMAN**
Texas State Bar No. 07469300
Email: lfriedman@fflawoffice.com
**JAMES ROBERT KRAUSE**
Texas Bar No. 11714525
Email: jkrause@fflawoffice.com
**SHAUNA A. IZADI**
Texas Bar No. 24041170
Email: sizadi@fflawoffice.com
**BRAULIO E. GONZALEZ**
Texas State Bar 24111350
bgonzalez@fflawoffice.com

**FRIEDMAN & FEIGER, LLP**
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
Telephone (972) 788-1400
Facsimile (972) 788-2667
**ATTORNEYS FOR KC DISTRIBUTING, LLC**

**EXHIBIT 4**



**Red Bull North America, Inc.**

June 25, 2020

**HAND DELIVERY AND EMAIL (*Kelly.Clymer@kcdist.net*)**

KC Distributing, LLC
Kelly Clymer
10615 Fishtrap Road
Aubrey, TX 76227

RE:     **NOTICE OF TERMINATION**

Dear Kelly:

Reference is made to that certain: (i) Distribution Agreement entered into as of July 1, 2008 (as the same may have been amended from time to time, the "Agreement") by and between Red Bull North America, Inc. ("Company") and KC Distributing, LLC ("Distributor"); (ii) Notice of Default and 7 Day Notice to Cure dated June 15, 2020 from Company to Distributor ("First Notice of Default"); (iii) Notice of Default and 7 Day Notice to Cure dated June 18, 2020 from Company to Distributor ("Second Notice of Default"); and (iv) Notice of Default and 7 Day Notice to Cure dated June 22, 2020 ("Third Notice of Default"). Capitalized terms used in this letter and not otherwise defined shall have the same meaning as defined in the Agreement.

As referenced in the First Notice of Default, Second Notice of Default, and Third Notice of Default, Distributor has breached the Agreement. Moreover, Distributor has failed to cure the default described in the First Notice of Default by the time permitted under the Agreement. Accordingly, pursuant to Section VIII.C.1 of the Agreement, the Company, effective immediately (the "Termination Effective Date"), hereby terminates the Agreement for cause because Distributor has failed or refused to pay the invoices listed in the First Notice of Default and the default has continued for a period of 7 days after written notice of default was provided by Company to Distributor. Additionally and/or alternatively, Company, effective immediately, hereby terminates the Agreement for cause, pursuant to section VIII.C.9, because Distributor, in the past, consecutive 24 months, has received 3 or more notices of default of the Agreement.

The Company notes that it continues to receive complaints from Accounts in the Territory that Distributor has failed to adequately service the Accounts and/or otherwise appears to have abandoned, failed, and/or refused to actively carry out its duties under the Agreement. Despite Distributor's obligations to comply fully with its duties under the Agreement and Company's demand in its Third Notice of Default that Distributor do so, Distributor has failed and refused to comply.

Demand is hereby made that, as of the Termination Effective Date, Distributor fully and completely comply with Section IX of the Agreement, including, without limitation: (i) immediately and permanently remove and cease using, in any manner whatsoever, the Proprietary Marks and Confidential Information; (ii) immediately refrain from doing any act which suggests or implies that Distributor is, or was, an authorized Product Distributor; (iii) cancel all advertising and promotional activities which associate Distributor with Product or Company; (iv) keep all Confidential Information in confidence and not use or disclose it to any third party; and (v) immediately deliver to Company, at Distributor's sole expense and without compensation, all written or electronic materials constituting Confidential Information and a true and correct list of the names and addresses of all Accounts that have purchased Product from Distributor during the 6 months before termination of this Agreement.

The Company specifically reserves any and all rights it has under the Agreement and applicable law, including, but not limited to, the right to seek the recovery from Distributor of the Company's damages caused by Distributor's breaches of the Agreement.

Sincerely,

*Joe Waters*

Joe Waters
Vice President/General Manager, SOBU
Red Bull North America, Inc.

{RB00050650 V2}

**EXHIBIT 5**



— DALLAS & PUERTO RICO —

June 25, 2020

*Via Email* joe.waters@redbull.com
Joseph Waters
Red Bull North America, Inc.

RE:    KC DISTRIBUTING, LLC

Dear Mr. Waters:

I am writing on behalf of my client, KC Distributing LLC ("Distributor" and/or "KC"), in response to your letter of June 25, 2020 purporting to terminate KC Distributing LLC ("Distributor" and/or "KC") in order to clarify certain matters that you raised and to set the record straight.

Your attempt to terminate KC Distributing "for cause" is blatant retaliation in response to the lawsuit that my client filed against Red Bull and its representatives a few days ago. Red Bull's new-founded  purported termination "for cause" is apparent for what it is—a direct threat by Red Bull and an attempt to intimidate KC and its principal, Kelly Clymer. These thug-like tactics by Red Bull is consistent with the manner in which it has treated KC over the years and the way it has treated its other Red Bull distributors.

As clearly set forth in KC's Petition against Red Bull, Red Bull repudiated its agreements and breached its partnership agreement with KC by, among other things, unlawfully terminating KC's Red Bull's distribution rights in February of 2020. Red Bull's prior material breaches excuse any alleged default you allege KC to have committed--which KC categorically hereby denies. Until Red Bull breached the parties' agreements, KC had been a good partner, in good standing and timely paid for all goods.

Moreover, Red Bull unilaterally "terminated" the 2008 Distribution Agreement effectively on May 1, 2020 with no mention of any "cause." Red Bull's unilateral proclamation in March that KC continue distributing Red Bull's products until June 30, 2020 did not "revive" the Distribution Agreement. Thus, there can be no breach by KC, and Red Bull has no right to terminate KC "for cause" or otherwise.  KC will be forced to stop delivering Red Bull products and servicing its customers, effectively around June 26, 2020, because Red Bull has failed and refused to deliver any more products to KC despite KC's history of full payment, and distinguished performance in sales.

Joseph Waters
June 20, 2020
Page 2

KC has been, and continues to be ready and willing to perform under the parties' agreements, but for Red Bull's material breaches of the partnership and distributorship agreements.

This letter is not intended to constitute, nor shall it be deemed to constitute, a full statement of all facts, rights, or claims relating to this matter, nor is it intended, nor should it be construed as a waiver, release, or relinquishment of any rights or remedies available to my client, including rights to seek recovery of damages and attorney's fees from Red Bull, whether legal or equitable, all of which are hereby expressly reserved.

Sincerely,

/s/ *Lawrence J. Friedman*

Lawrence J. Friedman

cc:     Kelly Clymer

88